[Cite as *State v. Bell*, 2020-Ohio-4510.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                 CASE NO. 9-18-40

    v.

CORY BELL,

                                       **O P I N I O N**

    DEFENDANT-APPELLANT.

---

Appeal from Marion County Common Pleas Court
Trial Court No. 2018 CR 0144

**Judgment Affirmed**

Date of Decision:    September 21, 2020

---

APPEARANCES:

    *Thomas A. Gjostein* **for Appellant**

    *Nathan R. Heiser* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Cory Bell ("Bell"), appeals the October 9, 2018 judgment of sentence of the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case arises from a March 2018 incident in which Bell allegedly restrained and raped E.M., a former romantic partner. According to E.M., on the evening of March 28, 2018, she walked to Bell's house to speak with him about some text messages he had sent her over the preceding two days and to confront him about threats he had directed toward her brother. When E.M. arrived at Bell's house, Bell allowed her into his bedroom. Shortly after E.M. entered Bell's bedroom, Bell allegedly grabbed E.M., pinned her arms to her sides, and pushed her onto his bed. E.M. alleged that, in the minutes that followed, Bell bound her hands with rope, forced his penis into her mouth, penetrated her vagina with a flashlight, and engaged in vaginal intercourse with her.

{¶3} On April 5, 2018, the Marion County Grand Jury indicted Bell on four counts: Counts One through Three of rape in violation of R.C. 2907.02(A)(2), first-degree felonies, and Count Four of kidnapping in violation of R.C. 2905.01(A)(4),

a first-degree felony.[1]  (Doc. No. 1).  On April 9, 2018, Bell appeared for arraignment and pleaded not guilty to the counts of the indictment.  (Doc. No. 6).

{¶4} A jury trial commenced on September 18, 2018.  (Doc. Nos. 49, 56); (Sept. 18-20, 2018 Tr., Vol. I, at 9).  On September 20, 2018, the jury found Bell guilty of Counts Three and Four.  (Doc. Nos. 93, 94).  However, the jury found Bell not guilty of Counts One and Two.  (Doc. Nos. 91, 92).

{¶5} On October 5, 2018, the trial court sentenced Bell to nine years in prison on Count Three and nine years in prison on Count Four.  (Doc. No. 100).  The trial court ordered that the sentences for Counts Three and Four be served concurrently for an aggregate term of nine years' imprisonment.  (*Id.*).  The trial court filed its judgment entry of sentence on October 9, 2018.  (*Id.*).

{¶6} On November 5, 2018, Bell filed a notice of appeal.  (Doc. No. 104). He raises two assignments of error for our review, which we elect to consider out of order.

### Assignment of Error No. II

**Appellant's conviction was not supported by the sufficiency of the evidence in violation of the due process clause of the Fourteenth Amendment to the U.S. Constitution and Article I, Sections 1 & 16 of the Ohio Constitution and the conviction was also against the manifest weight of the evidence.  [Tr. Overall].**

---

[1] Count One related to the allegation that Bell forced E.M. to perform fellatio.  (Doc. No. 16).  Count Two related to the allegation that Bell penetrated E.M.'s vagina with a flashlight.  (*Id.*).  Count Three related to the allegation that Bell had nonconsensual vaginal intercourse with E.M.  (*Id.*).

{¶7} In his second assignment of error, Bell argues that his rape and kidnapping convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶8} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380,

¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386.

{¶10} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶11} In this case, Bell was convicted of one count of rape and one count of kidnapping. The offense of rape is codified at R.C. 2907.02, which provides, in relevant part, that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of

force." R.C. 2907.02(A)(2) (Jan. 1, 2008) (current version at R.C. 2907.02(A)(2) (Mar. 22, 2020)). "Sexual conduct" includes "vaginal intercourse between a male and female * * *." R.C. 2907.01(A) (Jan. 1, 2008) (current version at R.C. 2907.01(A) (Mar. 22, 2019)). "Penetration, however slight, is sufficient to complete vaginal * * * intercourse." *Id.*

{¶12} The offense of kidnapping is codified at R.C. 2905.01, which provides, in relevant part, that "[n]o person, by force, * * * shall * * * restrain the liberty of [another], for any of the following purposes: * * * [t]o engage in sexual activity, as defined in [R.C. 2907.01], with the victim against the victim's will." R.C. 2905.01(A)(4) (Sept. 30, 2011) (current version at R.C. 2905.01(A)(4) (Mar. 22, 2019)). As defined in R.C. 2907.01, "sexual activity" includes "sexual conduct." R.C. 2907.01(C) (Jan. 1, 2008) (current version at R.C. 2907.01(C) (Mar. 22, 2019)). "Under R.C. 2905.01(A), '"the [culpability] of the statute is purpose[.]"'" *State v. Bentz*, 3d Dist. Allen No. 1-16-17, 2017-Ohio-5483, ¶ 110, quoting *State v. Montgomery*, 2d Dist. Montgomery No. 22193, 2009-Ohio-1415, ¶ 12, quoting *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 145.

{¶13} "Force" is an element of both R.C. 2907.02(A)(2) and R.C. 2905.01(A)(4). "Force" means "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1) (Apr. 6, 2017) (current version at R.C. 2901.01(A)(1) (Mar. 22, 2019)). Furthermore,

R.C. 2907.02(A)(2) and 2905.01(A)(4) each require the State to prove that the defendant acted purposely. *Bentz* at ¶ 110; *Starcher v. Eberlin*, 7th Dist. Belmont No. 08 BE 19, 2008-Ohio-5042, ¶ 16-17. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶14} At trial, the State's first witness was Jeanne Henry ("Henry"), one of E.M.'s best friends. (Sept. 18-20, 2018 Tr., Vol. I, at 174). Henry testified that on March 28, 2018 at approximately 7:00 p.m., she and E.M. communicated via text message and spoke on the phone. (*Id.* at 177-179, 190). According to Henry, E.M. told her that she was walking over to Bell's house to speak to him. (*Id.* at 178-179). Henry stated that she insisted on accompanying E.M. to Bell's house and that she requested that E.M. delay going to Bell's house until she got off of work. (*Id.* at 179). However, Henry testified that E.M. would not wait for her before going to Bell's house. (*Id.* at 190).

{¶15} Henry stated that E.M. did not contact her again until approximately 8:45 or 9:00 p.m., at which time E.M. called her. (*Id.* at 180, 193). Henry testified that E.M. was crying during the phone call. (*Id.*). After this phone call, Henry went to pick up E.M. According to Henry, when she picked up E.M., E.M. "was shaking

-7-

to the point where [her] entire car was shaking; [she] would not stop crying." (*Id.* at 181). Henry described E.M. as "distraught" and testified that she could barely speak when she first got into the car. (*Id.*). Henry stated that she called her father for advice and that her father suggested taking E.M. to the emergency room at Marion General Hospital ("Marion General"). (*Id.* at 182). Following her father's advice, Henry took E.M. to Marion General. Henry testified that at Marion General, E.M. "couldn't stop crying" and "wasn't herself." (*Id.* at 185-186). Henry contrasted E.M.'s emotional state at Marion General with her emotional state during their conversation before E.M. went to Bell's house. She stated that before E.M. went to Bell's house, "[s]he was fine. She had no problem talking to [her]. She was her happy-go-lucky, flying-a-kite kind of * * * person before she got there." (*Id.* at 192).

{¶16} The State's next witness was Shelby Landoll ("Landoll"), a Sexual Assault Nurse Examiner ("SANE") at Marion General. (*Id.* at 196). Landoll testified that she examined E.M. on March 28, 2018. (*Id.* at 211-212). Landoll stated that E.M. initially presented as calm but a "little disheveled." (*Id.* at 212). She testified that E.M.'s mood changed during the examination and that she alternated between anger and sadness. (*Id.* at 212-213).

{¶17} Landoll testified that during the examination, E.M. disclosed that she had lost consciousness at some point during the alleged assault. (Sept. 18-20, 2018

Tr., Vol. I, at 218). She also stated that E.M. claimed that Bell had applied force to her neck. (*Id.* at 218-219). According to Landoll, she observed several injuries to E.M. that she believed to be consistent with this account. Landoll testified that she saw one red dot behind E.M.'s ear, which she identified as a petechia, and that she noted yellow-brown bruising spanning from the middle of E.M.'s throat to the left side of her neck. (*Id.* at 219-223); (State's Exs. 10, 11, 15). In addition, Landoll discovered dirt and debris on E.M.'s neck, which suggested to Landoll that something might have been placed around E.M.'s neck. (Sept. 18-20, 2018 Tr., Vol. I, at 223).

{¶18} Furthermore, Landoll "distinctly remember[ed] walking in and seeing ice packs on both [of E.M.'s] wrists." (*Id.* at 212). She testified that E.M. presented with apparent ligature marks all the way around each of her wrists. (*Id.* at 224); (State's Exs. 12, 17, 18). Landoll stated that the redness, cuts, and scratches on E.M.'s wrists were "consistent with the history that she gave * * *; that she was tied up with nylon rope; and then that she did try to fight the rope off but wasn't able to. So the scratches might be * * * [from] trying to fight off." (Sept. 18-20, 2018 Tr., Vol. I, at 228).

{¶19} Additionally, Landoll testified that E.M. reported pain and tenderness in her genitals. (*Id.* at 230). However, Landoll stated that there was nothing abnormal discovered during E.M.'s pelvic exam and that there were no signs of

genital trauma. (*Id.* at 229-231). She testified that it is possible for a sexual assault victim to experience pain without any outward indicators of physical trauma. (*Id.* at 230). She further testified that as many as 90 percent of sexual assault victims who present for examination do not exhibit anal or genital trauma. (*Id.* at 211, 229). Landoll opined that E.M.'s injuries were consistent with her report of the alleged sexual assault and that she was not surprised that E.M. did not present with trauma. (*Id.* at 245).

{¶20} On cross-examination, Landoll testified that the ligature marks on E.M.'s wrists could also be consistent with voluntary binding as part of a sex act. (*Id.* at 248). Landoll also stated that other indicators of potential strangulation, such as neck swelling or tenderness, hoarseness, or shortness of breath, were not documented during E.M.'s examination. (*Id.* at 258). However, though she testified that these are indicators of strangulation, she stated that they are not necessarily present in every instance of strangulation and that a person who has been strangled can have one, all, or none of these indicators. (*Id.*). With respect to the bruising that she observed on E.M.'s neck, Landoll was unable to offer an opinion as to when E.M. sustained the bruises. (*Id.* at 261). She testified that many different factors affect how bruises age and how bruises look when they age. (*Id.* at 261-262).

{¶21} Landoll testified that because she did not observe any trauma, she concluded that it was unnecessary to take photographs of E.M.'s genitals. (Sept.

18-20, 2018 Tr., Vol. I, at 268-269). She stated that she did not observe any damage to E.M.'s hymen and that her hymen was completely normal for a woman who may have had sexual intercourse a few hours before the examination or at any time in her life. (*Id.* at 273-274). Landoll reiterated that E.M.'s pelvic exam did not reveal any abnormalities, despite the fact that E.M. reported pelvic pain. (*Id.* at 274). She testified that the presence of genital injuries and the absence of genital injuries are both consistent with and support a finding of sexual assault. (*Id.* at 279-280). Finally, Landoll confirmed that E.M. had reported that she kneed Bell in his testicles during the alleged assault and that she bit him above his elbow. (*Id.* at 270-273).

{¶22} On redirect examination, Landoll testified that during the examination, E.M. never stated that she had consensual sexual intercourse with Bell on March 28, 2018 or that she consented to having her wrists bound. (*Id.* at 276). Landoll stated that "[t]here [were] many times where [E.M.] said that she wanted let go and she was asking why [Bell] was doing this to her and that she wanted to leave." (*Id.*). Further, she testified that although swelling of the neck may be a sign of strangulation, "[t]here may be no signs whatsoever, no outward physical signs whatsoever of strangulation. That's very, very possible and common." (*Id.* at 277). Finally, in response to a question posed by a member of the jury, Landoll stated that she could not offer an opinion as to when the injuries to E.M.'s wrists or neck were inflicted. (*Id.* at 283).

{¶23} Following Landoll's testimony, Darlene Schoonard ("Schoonard"), who also works as a SANE at Marion General, testified that she examined Bell on the morning of March 29, 2018. (Sept. 18-20, 2018 Tr., Vol. II, at 291-292, 298-299, 303). Schoonard testified that she did not document any trauma to or discharge on Bell's genitals. (*Id.* at 302). However, she stated that she found petechiae on Bell's tongue, an abrasion on the left side of Bell's face, superficial scratches on Bell's back and on his buttocks, a superficial abrasion on his left wrist, an abrasion on his right index finger, and abrasions on both of his knees. (*Id.*).

{¶24} On cross-examination, Schoonard testified that she had the ability to observe Bell's entire body during the examination. (*Id.* at 314). She stated that she did not find any bite marks on Bell's body. (*Id.*). Schoonard testified that, as a SANE, she is trained to look for things like redness, tenderness, and swelling in a patient's groin, but that she did not observe bruising, swelling, or any other indicator of injury in the area of Bell's groin. (*Id.*). She also testified that she did not observe any injury to Bell's penis. (*Id.* at 317-318). Schoonard agreed that the abrasions on Bell's body could have been caused by "everyday living," and she testified that none of the abrasions on Bell's body was consistent with a bite mark. (*Id.* at 315). She also testified that the scratches on Bell's face could be consistent with "pimple popping." (*Id.* at 316-317). However, on redirect examination, Schoonard testified

that perpetrators of sexual assault "present with no trauma most of the time." (*Id.* at 319).

{¶25} The State then offered the testimony of Detective Nick Esterline ("Detective Esterline") of the Marion Police Department. (*Id.* at 322). Detective Esterline testified that he participated in the execution of a search warrant at Bell's house. (*Id.* at 323-324). He stated that during the search of Bell's bedroom, he located a section of white rope in a red laundry basket and seized it. (*Id.* at 325-326); (State's Exs. 5, 39). Detective Esterline described the length of rope as being looped with a knot at one end. (Sept. 18-20, 2018 Tr., Vol. II, at 331); (State's Ex. 40).

{¶26} On cross-examination, Detective Esterline testified that E.M. had claimed that the rope used to tie her hands was similar to fishing line. (Sept. 18-20, 2018 Tr., Vol. II, at 341). However, he agreed that the rope discovered in Bell's bedroom "doesn't look like fishing line at all." (*Id.*).

{¶27} The State also offered the testimonies of Andrew Sawin ("Sawin") and Hallie Dreyer ("Dreyer"), forensic scientists at the Ohio Bureau of Criminal Investigation. (*Id.* at 370). Sawin testified that, with respect to swabs taken from the inside of E.M.'s vagina, a mixture of DNA profiles was found. (*Id.* at 379-380). He stated that of the DNA profiles that were suitable for comparison, E.M. was identified as a contributor; Bell was "excluded from the interpretable data." (*Id.* at

379-380). Sawin explained that "the conclusion of Cory Bell excluded from interpretable data means that for the portion of that mixture that [he] could make comparisons with, Cory Bell was excluded from that portion." (*Id.* at 380-381). However, he stressed that, concerning the genetic information that was not suitable for comparison, he could not determine who the contributor was. (*Id.* at 381). Sawin testified that the swabs from E.M.'s mons pubis yielded a similar result. That is, E.M. was included as an expected contributor and a male component was found, but Bell was excluded from the interpretable data. (*Id.* at 381-382).

{¶28} Sawin also testified about the results of the testing of the swabs taken from Bell. Sawin stated that a mixture of DNA profiles was found on swabs taken from Bell's penis and testicles. (Sept. 18-20, 2018 Tr., Vol. II, at 383). He testified that E.M.'s DNA was included as a minor component of that mixture and that "the statistics that accompany that inclusion is 1 in 3 billion." (*Id.* at 383-385). He also testified that a mixture of DNA profiles was detected in swabs of Bell's suprapubic area, that E.M. was identified as a contributor to that mixture, and that "the statistic to accompany that inclusion is rarer than 1 in 1 trillion." (*Id.* at 385). Furthermore, Sawin stated that E.M. was identified as a contributor to a mixture of DNA found on Bell's left thigh. (*Id.* at 386). However, he testified that although a mixture of DNA profiles was detected on swabs taken from Bell's right thigh, E.M. was excluded from the interpretable data. (*Id.*).

{¶29} As for Dreyer, she testified about the results of Y-STR DNA testing performed on the swabs taken from E.M.'s body. Dreyer explained that "Y-STR DNA is a male-specific DNA test where we look at DNA that is unique to the Y chromosome, which only males possess." (*Id.* at 426). She testified that, with respect to male DNA found on the swabs from the inside of E.M.'s vagina, "[t]he only profile that was interpretable was that from the non-sperm fraction and that profile is consistent with Cory Bell. He had been included. * * * [N]either Cory Bell, nor any of his paternal male relatives can be eliminated as the source of this DNA profile." (*Id.* at 427). She stated that these results "g[ave] [her] a frequency of 1 in 699 unrelated males." (*Id.* at 427-428). Dreyer testified that similar results were obtained from E.M.'s perianal swabs, where testing found a single male DNA profile consistent with Bell's DNA at a frequency of 1 in 699 unrelated males. (*Id.* at 428-429). Dreyer also testified that non-sperm DNA consistent with Bell's DNA was recovered from the swabs of E.M.'s mons pubis. (*Id.* at 429). However, because this DNA provided only a partial profile, Dreyer could determine only that this profile "would not occur more frequently than 1 in 58 males." (*Id.*). Moreover, from the available materials, Dreyer could not determine when Bell's DNA was deposited on or in E.M. (*Id.* at 440-441). Finally, Dreyer cautioned that Y-STR DNA testing cannot be used to make a "unique identification." (*Id.* at 431).

{¶30} E.M. was the State's next witness. She testified that she met Bell in October 2017 using the online dating service Plenty of Fish. (*Id.* at 447). E.M. stated that she and Bell started having sexual relations soon after they met and that she initially attempted to build a relationship with Bell. (*Id.* at 448-449). She testified, however, that by November 2017, she and Bell stopped talking to each other and mutually agreed to part ways. (*Id.* at 448-449). Yet, according to E.M., by January or February 2018, she and Bell began talking again. (*Id.* at 450). She testified that in the ensuing weeks, she and Bell had sexual intercourse two or three times, but that by the end of February 2018, Bell "seemed like he was getting really possessive and demanding [that she] constantly come over and everything." (*Id.* at 450-451). E.M. stated that, as a result, she withdrew from Bell and stopped going over to his house. (*Id.* at 451-452). She also testified that she decided that she no longer wanted to pursue a relationship with Bell in part because she was attempting to reunite with an ex-boyfriend. (*Id.* at 452).

{¶31} E.M. testified that even after she stopped going over to Bell's house, Bell continued to send her numerous text messages. (Sept. 18-20, 2018 Tr., Vol. II, at 452-453). She stated that she frequently did not respond to Bell's text messages and that Bell grew increasingly upset because she failed to respond to his messages and refused to go over to his house. (*Id.* at 456). E.M. testified that on March 27, 2018, the day before the alleged assault, Bell told her via text message that he

needed to talk to her in person. (*Id.* at 458). According to E.M., by this time, she had not been to Bell's house or had sexual relations with Bell for several weeks. (*Id.* at 459, 469). She stated that she told Bell that she did not want to go over to his house and that she did not want to talk to him anymore. (*Id.* at 459).

{¶32} E.M. testified that despite her efforts, Bell persisted in trying to get her to come over to his house. She stated that on March 28, 2018, she was playing video games with her brother when she received a phone call from Bell. (*Id.* at 464). She testified that Bell asked her whether she was going to come over to his house. (*Id.*). E.M. stated that during this phone call, she was trying to get Bell to tell her what it was that he needed to talk to her about in person. (*Id.*). She testified that Bell sounded upset because she kept giving him excuses for why she could not go over to his house at that time. (*Id.* at 465). According to E.M., while she was talking to Bell, her brother "jokingly comment[ed] that [she was] not allowed to leave." (*Id.*). E.M. stated that she related this comment to Bell and that Bell responded by threatening to "whop [sic] [her] little brother's ass." (*Id.* at 465-466). She testified that she then hung up the phone and that, after receiving more text messages from Bell threatening her brother, she made a decision. (*Id.* at 467). E.M. stated that her "decision was to go over there because [she] was going to confront [Bell] face to face about him threatening [her] little brother and because of the fact of the matter

that [she] had to pretty much already go over there to figure out what's wrong with him." (*Id.*).

{¶33} E.M. testified that, having decided to go over to Bell's house to confront him, she armed herself with a hunting knife. (*Id.* at 469-470). She stated that she brought the knife because she "get[s] very sketchy when it comes to situations of going to talk to somebody who's already in a[n] * * * aggravated mood, so it's a first instinct for [her] to have something to protect [herself]." (*Id.* at 469-470). She insisted that she did not bring the knife with the intention to attack Bell, but she admitted telling her housemates, "If I don't come back tonight or you get a call from jail, it's probably because I did kill him." (*Id.* at 472). E.M. testified that she put the knife in her back pocket and began walking over to Bell's house between 7:30 and 8:00 p.m. (*Id.* at 470-471). She confirmed that she called Henry en route to Bell's house and that Henry requested that she not go to Bell's house unaccompanied. (*Id.* at 471). E.M. stated that she did not wait for Henry to come with her because she did not know what Bell would do when she got to his house and she did not want Henry to get hurt. (*Id.*).

{¶34} E.M. testified that when she arrived at Bell's house, she walked in the door, confronted him, and told him that if he "ever threaten[ed] [her] little brother again, [she would] end [him]." (Sept. 18-20, 2018 Tr., Vol. II, at 474). She stated that Bell said little in response, but that he instead "grabbed [her] as though of a

-18-

hug, pinning [her] arms to [her] side, and then he started to kiss [her], and [she] told him, 'No.'" (*Id.*). E.M. said that it felt like Bell was giving her a "bear hug" from the front. (*Id.*). She testified that she tried to pull away and break free from Bell, and she stated that though she is bigger than Bell, she was unable to free herself because she does not have a lot of muscle mass in her arms. (*Id.* at 475). She stated that she suffers from a medical condition that limits her arms' range of motion and that she cannot move her arms well when they are pinned "at an exact point" on her side. (*Id.*).

{¶35} E.M. testified that Bell "w[ound] up walking [her] backwards to his bed, and [she] wound up being pretty much pushed onto the bed." (*Id.* at 476). She stated that Bell then got on top of her and resumed trying to kiss her. (*Id.*). E.M. testified that for the next 5 to 6 minutes, she tried to push Bell off of her while telling him that she did not want to have sex with him. (*Id.* at 476-477). E.M. stated that Bell eventually placed one foot on the floor, keeping his other leg on top of her to restrain her, and reached under his bed to grab a length of rope. (*Id.* at 477-479). She testified that

> at the point in time where he went and reached under the bed, [she] went to go get back up, and [she] wasn't able to get up in time before he grabbed it and pushed [her] down. He was able to get [her] left hand tied, and as [she] was trying to push him off of [her] with [her]

right and untie it from [her] left hand, he managed to grab [her] right hand and tie it up with [her] left. And as all of this is going on, [she was] having [her] hands pinned against [her] chest and trying to push off of him.

(*Id.* at 477-478). E.M. identified State's Exhibit 40 as the rope that Bell used to bind her wrists. (*Id.* at 482-483); (State's Ex. 40).

{¶36} According to E.M., after her wrists were bound, Bell continued to try to kiss her. (Sept. 18-20, 2018 Tr., Vol. II, at 484). She testified that, at this point in time, she tried to retrieve the hunting knife from her back pocket and that she was able to get her fingers on one end of the knife. (*Id.* at 485). E.M. stated, however, that because Bell noticed that she was moving her hands toward her back pocket, she stopped reaching for the knife. (*Id.*).

{¶37} E.M. testified that after some time on the bed, Bell moved her from the bed to the floor. (*Id.* at 486). She stated that as Bell took her off of the bed, she "kick[ed] him in the genitals." (*Id.*). E.M. testified that after she kicked Bell, Bell got angry, pushed her down to the floor, got on top of her, and tried to kiss her again. (*Id.*). She claimed that Bell then tried to force her to perform fellatio. (*Id.* at 488-490). According to E.M., as Bell was doing this, his hands slipped and he grabbed her throat. (*Id.* at 490). She said that she gasped for air and could not breathe for a moment. (*Id.* at 490-491).

{¶38} E.M. testified that, after this, Bell removed her pants and retrieved a flashlight. (*Id.* at 492-493). She stated that while Bell busied himself with the flashlight, she attempted to get off of the floor but was unable to due to her medical problems and the fact that her hands were tightly bound. (*Id.* at 493). According to E.M., when Bell returned, he forced her legs open and penetrated her vagina with the flashlight. (*Id.* at 494-496). E.M. testified that after 5 to 10 minutes, Bell stopped using the flashlight and tried to force her to perform oral sex again. (*Id.* at 496-497). She stated that Bell finally "wound up going back to [her] vagina and inserting his penis in [her]." (*Id.* at 497).

{¶39} E.M. testified that after this ordeal ended, Bell untied her wrists. (Sept. 18-20, 2018 Tr., Vol. II, at 498). She stated that her wrists had turned black and blue, that her hands were "freezing," and that she could see "massive discoloration." (*Id.*). E.M. testified that after Bell untied her, she sat on the floor collecting herself for a few moments before standing up and putting her pants back on. (*Id.*). She stated that Bell permitted her to collect her cell phone and knife, both of which had been thrown under Bell's bed during the struggle. (*Id.* at 502). She stated that while she remained in Bell's bedroom, Bell kept apologizing to her and told her that he "fucked up." (*Id.* at 499). E.M. spoke with Bell for a few minutes before leaving, and she testified that as she was leaving, she promised Bell that she would not go to the police. (*Id.*). She testified that as she walked away from Bell's house, she heard

him loudly exclaim, "Fuck." (*Id.*). E.M. confirmed that after leaving Bell's house, she was picked up by Henry and taken to Marion General. (*Id.* at 500-501).

{¶40} E.M. denied that she went to Bell's house to have sex with Bell, and she denied that she and Bell ever engaged in "rough sex." (*Id.* at 473). Furthermore, E.M. testified that Bell had never previously bound her wrists and that she never asked Bell to tie her wrists on the day of the incident or at any time previously. (*Id.*). She also testified that she never asked Bell to keep her on the bed or on the floor against her will. (*Id.*). Finally, E.M. stated that at no time during the incident did she decide to have consensual sex with Bell. (*Id.* at 483-484).

{¶41} On cross-examination, E.M. testified that she suffers from anxiety, "slight" depression, schizophrenia, and bipolar disorder. (Sept. 18-20, 2018 Tr., Vol. II, at 520). She agreed that she occasionally does things that can be attributed to her mental illnesses that she later regrets having done. (*Id.* at 521).

{¶42} In addition, E.M. testified that she never engaged in bondage during consensual sex and that she never permitted Bell to bind her wrists. (*Id.* at 523). She insisted that she never participated in bondage in any prior sexual relationship and that she hates being tied up. (*Id.* at 524). When asked whether she told an attorney who was previously involved in the case that she allowed Bell to bind her wrists, E.M. denied making any such statement. (*Id.* at 523).

{¶43} When questioned about her claim that she kneed Bell in the groin, E.M. testified that she kneed him with "what force [she] had" and that she was sure that she made contact with his genitals. (*Id.* at 543). She also stated that she bit Bell as hard as she could on his left arm above his elbow. (*Id.*).

{¶44} On redirect examination, E.M. testified that her schizophrenia and bipolar disorder do not interfere with her daily life. (Sept. 18-20, 2018 Tr., Vol. II, at 556). Although she admitted that she did not take the medicine prescribed for those disorders on the day of the alleged incident, she testified that she had taken her medication the day before and that the only reason she had not taken her medication was because the prescriptions were being refilled at the pharmacy. (*Id.*). E.M. stated that she did not notice any change in her behavior brought on by having missed her medications. (*Id.*). Furthermore, she testified that she was not under the influence of any substance when she went to Bell's house. (*Id.* at 557). Finally, E.M. stated that she did not remember whether she broke Bell's skin when she bit him. (*Id.* at 558). She described the bite as a "quick bite." (*Id.*).

{¶45} Bell offered the testimony of only one witness, Dr. George Shaw ("Dr. Shaw"), who testified as an expert in emergency medicine. (Sept. 18-20, 2018 Tr., Vol. III, at 650). In Dr. Shaw's opinion, E.M. had engaged in vaginal sexual activity with a male because male DNA was found in her vagina. (*Id.* at 652, 654). In addition, he concluded that Bell "engaged in sexual activity with [E.M.]" because

"DNA samples from both individuals were on his penis." (*Id.* at 652). However, he "could not determine from either the laboratory evidence or the SANE exam" whether the sexual activity was consensual or nonconsensual. (*Id.*). Furthermore, Dr. Shaw believed that E.M.'s wrists "likely were bound as such is consistent with her physical exam findings," but he could not determine what was used to bind her wrists. (*Id.* at 652-653). Finally, Dr. Shaw concluded that E.M. "was not strangled as there is no medical evidence as such during her [emergency department] visit." (*Id.* at 652).

{¶46} When asked to elaborate on his conclusion that E.M. was not strangled, Dr. Shaw explained that his conclusion was based on the fact that the emergency room physician did not document any injuries to E.M.'s neck suggestive of strangulation or other signs that she had been strangled, such as hoarseness or shortness of breath. (*See id.* at 670). Dr. Shaw acknowledged that there were "discordances" between the emergency room physician's findings and Landoll's findings, but he felt that the emergency room physician was better qualified to determine whether E.M.'s symptoms were consistent with strangulation. (*Id.*). Dr. Shaw was also questioned about Landoll's findings that the petechia behind E.M.'s ear and the bruising to her neck were consistent with strangulation. He testified that the dot behind E.M.'s ear might be a petechia, but he stated that he could not determine from the available evidence whether it was a petechia. (*Id.* at 678-679).

Dr. Shaw testified that further testing was required to determine whether the dot was in fact a petechia and that there was no indication that Landoll performed this testing during her examination. (*Id.* at 679-680). Finally, Dr. Shaw stated that "[i]n general, an early bruise, 24 hours or less, is going to be purple, maybe blue * * *. Mainly reddish purple, just the primary colors. It becomes yellow-ish later on." (*Id.* at 680-681). He testified that yellow-brown coloring tends to develop later in the life of a bruise. (*Id.* at 681).

{¶47} On cross-examination, Dr. Shaw testified that "[a]ll patients are different" and that some people bruise differently than others. (*Id.* at 700). He stated that although it was his opinion that E.M. was not strangled, he could not conclude that "no hands were put around her neck." (*Id.* at 703). Dr. Shaw testified that he did not have an opinion about, and that there was no way to know, "how long hands could have been on [E.M.'s] neck." (*Id.* at 704). He stated that it is possible, though rare, for a strangulation victim to present with no external signs of strangulation. (*Id.* at 703-704). Finally, Dr. Shaw reiterated that his opinion that E.M. likely was not strangled was informed by the emergency room physician's report, notwithstanding Landoll's observations. (*Id.* at 704-707).

{¶48} We begin with Bell's argument that his rape and kidnapping convictions are not supported by sufficient evidence. First, Bell argues that his convictions are not supported by sufficient evidence because E.M.'s testimony was

not credible. Specifically, Bell contends that E.M. "was caught lying under oath while testifying." (Appellant's Brief at 13). He notes that E.M. "was caught lying about what occurred on the bed as she became tied up with rope, having given four different statements to the SANE * * * and the police over time." (*Id.* at 14). Bell also observes that, after having her recollection refreshed, E.M. "had to admit that she cheated on [him] with another former boyfriend * * *." (*Id.*). He further notes that E.M. testified that she experienced "extreme pain all about her person" during the incident but that she neglected to mention to Officer Michael Diem ("Officer Diem"), who questioned her shortly after the incident, that she was experiencing severe vaginal pain, though she told him about other pain she was experiencing. (*Id.*).

{¶49} Bell argues that other questionable aspects of E.M.'s testimony demonstrate that his convictions are not supported by sufficient evidence. Bell notes that E.M.'s testimony that he put his hands around her neck is undermined by Dr. Shaw's testimony that "yellow-brown bruise marks tend to be older by days * * *." (*Id.* at 13). He also contends that Schoonard's failure to find any "trauma, bite marks, bruising, redness, or swelling to his groin area" and the fact that "absolutely no marks could be found" on him despite E.M.'s claim that "she bit him as hard as she could" cast doubt on E.M.'s account of the alleged attack. (*Id.*).

{¶50} Furthermore, Bell seems to maintain that in light of the supposed unreliability of E.M.'s testimony, an alternative explanation of events, i.e., that he and E.M. engaged in consensual sexual intercourse, is more plausible. He points out that there was evidence that E.M. suffers from schizophrenia, depression, and bipolar disorder and that she did not take her prescribed medications on the day of the alleged incident. (*Id.* at 12). Bell argues that "[t]his combination of mental illness and lack of medical treatment * * * had caused the victim to engage in risky and irrational behaviors that she had regretted in the past." (*Id.*). He also implies that this pattern of risky behavior is illustrated by the fact that "another male's DNA was found in [E.M.'s] vagina." (*Id.* at 13). Moreover, Bell suggests that the reason E.M. did not wait for Henry to accompany her to his house was because E.M. was going to his house to engage in consensual sexual activity. (*See id.* at 12). He further claims that the jury ignored both "testimony which could not conclude that these acts were nonconsensual" and the fact that Landoll's "examination and findings are equally consistent between consensual and nonconsensual sex." (*Id.* at 12-13). Finally, he contends that the not guilty verdicts on Counts One and Two of the indictment are "completely inconsistent" with the guilty verdicts on Counts Three and Four and constitute "further concrete evidence of insufficiency of the evidence." (*Id.* at 14).

{¶51} Though Bell claims that he is challenging the sufficiency of the evidence supporting his convictions, it is clear that his arguments go to the weight, rather than the sufficiency, of the evidence. Therefore, Bell has failed to mount a proper challenge to the sufficiency of the evidence supporting his convictions. Even so, we have no difficulty concluding that Bell's rape and kidnapping convictions are supported by sufficient evidence. Viewing the evidence in a light most favorable to the State, E.M.'s testimony establishes that by pinning E.M.'s arms to her side, climbing on top of her and preventing her from getting up, and binding her wrists, Bell applied force against E.M. Furthermore, E.M.'s testimony supports that Bell's purpose in exerting this force against her was to restrain her liberty in order to engage in sexual conduct with her and to compel her to submit to this sexual conduct. Lastly, E.M.'s testimony and the DNA evidence support that Bell did in fact have vaginal intercourse with E.M., and E.M.'s testimony demonstrates that she did not consent to having vaginal intercourse with Bell. Accordingly, we conclude that any rational trier of fact could have found the essential elements of the offenses of rape and kidnapping proven beyond a reasonable doubt and that Bell's rape and kidnapping convictions are therefore supported by sufficient evidence.

{¶52} Having concluded that Bell's convictions are supported by sufficient evidence, we now consider whether his convictions are against the manifest weight of the evidence. In challenging the weight of the evidence supporting his

-28-

convictions, Bell simply repeats the arguments he made in his attempt to challenge the sufficiency of the evidence. (*See* Appellant's Brief at 15-16). As indicated above, these arguments fall into three general categories: (1) E.M.'s testimony was not credible and inconsistent with other established facts; (2) the best interpretation of the evidence is that E.M. and Bell had a consensual sexual encounter; and (3) Bell's convictions are inconsistent with his acquittals for Counts One and Two of the indictment. We address each of these categories in turn.

{¶53} First, we reject Bell's argument that his convictions are against the manifest weight of the evidence because E.M.'s testimony was unreliable and inconsistent with other evidence. With each inconsistency or alleged lie highlighted by Bell, E.M. was afforded an opportunity to explain, or at least acknowledge, the inconsistency or supposed lie. With respect to E.M.'s shifting accounts of what happened on Bell's bed and how she came to be tied up with the rope, E.M. explained that because she was "very emotionally distraught" when giving her accounts of the alleged incident to Officer Diem and Landoll, she may have omitted or mixed up details relating to how she was positioned on Bell's bed, how she moved about the bed, and how Bell retrieved the rope and bound her hands. (*See* Sept. 18-20, 2018 Tr., Vol. II, at 540-542).

{¶54} As for the issue of E.M. having to admit that she was once unfaithful to Bell, at one point in her testimony, Bell's trial counsel asked E.M. whether she

had told Officer Diem that she "did [Bell] wrong," and E.M. denied making such a statement "because [she did not] see why [she] would have said it." (*Id.* at 524-525). However, after she reviewed a recording of the statement she made to Officer Diem, she conceded that she told Officer Diem that she had wronged Bell. (*Id.* at 534). While she did not further clarify why she denied making the statement, she later explained that the statement related to the fact that she was "still having some * * * occasional sexual intercourse with [her] ex while [she] was talking to [Bell]." (*Id.* at 557). Finally, E.M. acknowledged that she disclosed her wrist injuries to Officer Diem, that Officer Diem asked her whether she had any additional injuries, and that she failed to tell Officer Diem that she was experiencing severe vaginal pain. (*Id.* at 552). She testified that the reason she did not mention her pain to Officer Diem was because it was "something [she] didn't want to exactly mention at that point in time * * *." (*Id.* at 553).

{¶55} Here, the jury was aware both of the inconsistencies or supposed lies in E.M.'s testimony and of E.M.'s explanations for these discrepancies. The jury, being able to observe E.M.'s demeanor and tone of voice, was uniquely positioned to decide whether to accept E.M.'s explanations and credit her testimony or reject her explanations and discount this testimony and her testimony generally. "'While the jury may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render [a] defendant's conviction

against the manifest weight * * * of the evidence.'" *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37, quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714, *3 (May 28, 1996). After reviewing the record, if the jury resolved these inconsistencies in favor of E.M. and elected to credit her testimony, we cannot say that it erred by doing so.

{¶56} Moreover, Bell's convictions are not against the manifest weight of the evidence simply because some of the physical evidence might have conflicted with E.M.'s account of the incident. Though Dr. Shaw opined that E.M. was not strangled and that the bruising on her neck would typically indicate an older bruise, he testified that it is possible for a strangulation victim to present without any external evidence of strangulation, and he and Landoll both testified that every person bruises differently. Furthermore, Dr. Shaw could not say that hands were not placed around E.M.'s neck. Thus, it would not have been unreasonable for the jury to conclude that E.M. was in fact strangled or that Bell put his hands around her throat but did not apply force sufficient to cause external injuries. In addition, while Bell did not exhibit any injuries to his groin or any signs that he had been bitten, the record contains evidence that would allow the jury to reconcile these discrepancies. Although E.M. stated that she kneed Bell in the groin with "what force [she] had," there is no evidence in the record speaking to how much force E.M. was capable of applying. Further, while E.M. reported that she bit Bell as hard

as she could, she also characterized the bite as a "quick bite." Accordingly, it would not have been impossible for the jury to conclude that E.M. kneed Bell in the groin and bit him with all the force she could muster, but that this force was not enough to produce injury capable of documentation the next day. Finally, and perhaps most importantly, "'[a] jury, as finder of fact, may believe all, part, or none of a witness's testimony.'" *State v. Barrie*, 10th Dist. Franklin No. 15AP-848, 2016-Ohio-5640, ¶ 22, quoting *State v. Taylor*, 10th Dist. Franklin No. 14AP-254, 2015-Ohio-2490, ¶ 34. Consequently, given the particular facts of this case and the evidence produced at trial, the jury could have found that E.M. did not knee or bite Bell or that she kneed and bit him with less force than she claimed but still have found Bell guilty of rape and kidnapping.

{¶57} Bell's second argument, that his convictions are against the manifest weight of the evidence because the evidence is more consistent with a finding of consensual sexual intercourse than with a finding of nonconsensual sexual intercourse, fares no better than his first argument. While Bell did not testify at trial, and therefore did not offer his own firsthand account of the incident, it is clear that a substantial objective of Bell's trial strategy was to suggest to the jury that he and E.M. had consensual sexual intercourse on March 28, 2018. Both during cross-examination of the State's witnesses and in the presentation of Dr. Shaw's testimony, Bell's trial counsel attempted to establish that the physical evidence was

as consistent with a finding of voluntary sexual intercourse as it was with a finding of involuntary sexual intercourse. Yet, the jury ultimately elected to accept the State's theory that Bell bound E.M.'s wrists against her will and engaged in nonconsensual vaginal intercourse over Bell's suggestion that the encounter was consensual. It is well established that "'[a] verdict is not against the manifest weight of the evidence because the finder of fact [chose] to believe the State's witnesses rather than the defendant's version of the events.'" *State v. Piatt*, 9th Dist. Wayne No. 19AP0023, 2020-Ohio-1177, ¶ 37, quoting *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16.

{¶58} Finally, we reject Bell's argument that his convictions are against the manifest weight of the evidence because his convictions for Counts Three and Four are irreconcilably inconsistent with the not-guilty verdicts returned for Counts One and Two. "Every count of a multiple-count indictment is considered to be distinct and independent of all the other counts[.]" *State v. Rardon*, 5th Dist. Delaware No. 17 CAA 04 0027, 2018-Ohio-1935, ¶ 73, citing *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, ¶ 15 (10th Dist.). Hence, "'[c]onsistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal.'" *State v. Smith*, 193 Ohio App.3d 201, 2011-Ohio-997, ¶ 22 (3d Dist.), quoting *Trewartha*

at ¶ 15, citing *State v. Adams*, 53 Ohio St.2d 223 (1978). "'[J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. * * * [I]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts.'" *State v. Gravelle*, 6th Dist. Huron No. H-07-010, 2009-Ohio-1533, ¶ 77, quoting *State v. Taylor*, 8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶ 10. Thus, the fact that the verdicts for Counts Three and Four might be inconsistent with the verdicts for Counts One and Two does not mean that Bell's convictions for Counts Three and Four are against the manifest weight of the evidence. *State v. Carson*, 5th Dist. Licking No. 18-CA-25, 2018-Ohio-5305, ¶ 44-47 (rejecting the appellant's argument that his gross sexual imposition conviction was against the manifest weight of the evidence "because it [was] somehow inconsistent with the acquittals on the rape and attempted-rape counts"); *State v. Norman*, 10th Dist. Franklin No. 10AP-680, 2011-Ohio-2870, ¶ 13-15 (concluding that the appellant's conviction was not against the manifest weight of the evidence despite the State's concession that the jury's verdicts were not consistent); *Gravelle* at ¶ 76-77.

{¶59} Bell's second assignment of error is overruled.


**Assignment of Error No. I**

**The appellant had his rights to due process of law violated under Article I, Section 10 of the Ohio Constitution and the Sixth**

**Amendment of the United States Constitution, in being compelled to stand trial when trial counsel was rendered ineffective for failing to object to the introduction of the SANE report for the victim prior to testimony by the SANE nurse. [Tr. Vol. I, 214].**

{¶60} In his first assignment of error, Bell argues that he received ineffective assistance of counsel. Specifically, Bell argues that his trial counsel was ineffective because his trial counsel "should have objected to the introduction of the SANE report of [E.M.] and testimony by [Landoll] at trial." (Appellant's Brief at 8). He contends that "the introduction of the SANE report contained enough prejudicial evidence, which was not admitted for a medical purpose or treatment and, thereby, prejudiced the jury against him on Counts 3 & 4 in the Indictment" and that "[b]ut for the introduction of this hearsay and tainted evidence, the jury likely would have acquitted [him] on Counts 3 & 4, as it did on Counts 1 & 2." (*Id.*).

{¶61} "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the

defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶62} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶63} After reviewing the record, we conclude that Bell has not established that he received ineffective assistance of counsel. First, we cannot conclude that Bell's trial counsel was ineffective for failing to object to the introduction of the SANE report because his trial counsel *did object* to the introduction of the report when the State sought to admit it at the close of its case. (*See* Sept. 18-20, 2018 Tr.,

Vol. III, at 627-630). Bell acknowledges that his trial counsel objected to the admission of the SANE report, but claims that "this objection was untimely, as the damage and prejudice to the jury had been done already." (Appellant's Brief at 8-9). We disagree. While Landoll had access to the SANE report during her testimony, she did not read extensively from the report during her testimony, and there is no indication that the jury had access to the full report at any time before the State moved to admit it. Thus, we fail to see how Bell's trial counsel's decision to defer a challenge to the admissibility of the SANE report until the State moved to admit the report was deficient or unreasonable under the circumstances.

{¶64} In addition, we cannot conclude that Bell's trial counsel performed deficiently or unreasonably by failing to object to the hearsay contained in Landoll's testimony. In her testimony, Landoll related several statements that E.M. made to her during the course of E.M.'s sexual assault examination on March 28, 2018. Almost without exception, in the statements Landoll testified about, E.M. described the events that allegedly caused her reported injuries and the attending circumstances. (*See, e.g.*, Sept. 18-20, 2018 Tr., Vol. I, at 218-219) ("[S]he did tell me that she blacked out * * *. She did say that he had force on her neck."); (*See, e.g., id.* at 228) (E.M. reported "that she was tied up with nylon rope; and then that she did try to fight the rope off but wasn't able to."). As these statements appear to have been made for purposes of medical diagnosis or treatment, as opposed to

having been made for criminal investigative purposes, and because they were reasonably pertinent to E.M.'s diagnosis or treatment, they fall squarely within Evid.R. 803(4), under which statements made for purposes of medical diagnosis or treatment are excepted from the rule against hearsay. Accordingly, we cannot fault Bell's trial counsel for failing to object to this testimony.

{¶65} Moreover, even if we were to conclude that Bell's trial counsel performed unreasonably or deficiently by failing to object to Landoll's testimony and by not objecting sooner to the admission of the SANE report, we cannot conclude that there is a reasonable probability that the outcome of Bell's trial would have been different if his trial counsel had successfully objected to the admission of this evidence. When the SANE report and Landoll's testimony about E.M.'s statements are set aside, there is still considerable evidence supporting that Bell kidnapped and raped E.M. E.M.'s trial testimony covered most of what is contained in the SANE report and in the portions of Landoll's testimony to which Bell now objects. E.M.'s testimony supports that Bell bound E.M.'s hands against her will, restrained her freedom of movement, and forced her to submit to vaginal intercourse. In addition, the photographic evidence showing ligature marks on E.M.'s wrists, the presence of E.M.'s DNA on Bell's genitals, suprapubic area, and thigh, and the likely presence of Bell's DNA inside of E.M.'s vagina substantiate

E.M.'s claims. Accordingly, even if Bell's trial counsel's performance was unreasonable or deficient, Bell has not demonstrated that he was prejudiced.

{¶66} Bell's first assignment of error is overruled.

{¶67} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**