[Cite as *State v. Cobb*, 2021-Ohio-3877.]

# IN THE COURT OF APPEALS OF OHIO
# THIRD APPELLATE DISTRICT
# ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KENNETH L. COBB,

    DEFENDANT-APPELLANT.

CASE NO. 1-20-43

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2019 0041

**Judgment Affirmed**

**Date of Decision:  November 1, 2021**

APPEARANCES:

    *Dustin M. Blake* **for Appellant**

    *Jana E. Emerick* **for Appellee**

Case No. 1-20-43

**WILLAMOWSKI, P.J.**

{¶1}    Defendant-appellant Kenneth L. Cobb ("Cobb") appeals the judgment of the Allen County Court of Common Pleas, alleging (1) that the trial court failed to include a jury instruction on self-defense; (2) that the trial court erred in explaining the justifications for the use of deadly force; (3) that the trial court erred in refusing to admit evidence of the violent characters of the victim and a witness; and (4) that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2}    Patrolman Kelly Ricker ("Patrolman Ricker") works for the Lima Police Department.  Tr. 249.  At about 3:30 A.M. on January 15, 2019, he was on duty and was dispatched to a location on Michael Avenue in Lima, Ohio.  Tr. 250.  There had been a report of "someone beating on the doors and screaming and yelling" in that area.  Tr. 250.  On his way to Michael Avenue, dispatch informed Patrolman Ricker "that there was a possible shooting * * *."  Tr. 251.

{¶3}    When he arrived at Michael Avenue, he observed a large sports utility vehicle stopped in the middle of the road.  Tr. 251-252.  Patrolman Ricker testified that

> **[i]t appear[ed] from the damages that they * * * had been traveling down the road at a significant speed and lost control,**

-2-

> **struck a pole on the driver's side of the vehicle and then the vehicle came to rest.**

Tr. 255. Ex. 1. He also saw that the rear passenger side door was open and that a man was "laying partially in and out of the * * * SUV backdoor. His legs were still inside the vehicle and his back was laying on the ground." Tr. 252. Ex. 4. He also only had one arm. Tr. 354. Ex. 4. This person was later identified as Branson Tucker ("Branson"). Tr. 252.

{¶4} Branson had what appeared to be a gunshot wound near his hip on the right side of his body. Tr. 256. Ex. 3. At this time, another police officer on the scene, Patrolman Kaitlyn Weidman ("Patrolman Weidman"), began to administer first aid to Branson. Tr. 254, 273. Patrolman Ricker testified that several, crumpled dollar bills were hanging outside of Branson's pockets. Tr. 257. Ex. 4. He stated that these bills "appear[ed] to be rushed and stuck inside the pocket." Tr. 257. Patrolman Ricker also noticed that the seat directly behind the front passenger seat of the vehicle was covered in blood. Tr. 258. Ex. 5-6.

{¶5} When Patrolman Weidman and Patrolman Ricker arrived at the scene of the accident, at least two other individuals, besides Branson, were present. Tr. 264, 274. These individuals were later identified as Chainze Tucker ("Chainze") and Kendrah McKee ("McKee"). Tr. 264. Chainze was Branson's nephew. Tr. 339. Patrolman Weidman testified that, when she first approached the vehicle on the roadway, Chainze was "standing over * * * [Branson,] saying that he [Branson]

had been shot." Tr. 273. She observed that Chainze "ha[d] blood on him, but he had no gunshot injuries." Tr. 276. Ex. 7. Patrolman Weidman further testified that Chainze was "very worked up"; was "trying to get us to help him [Branson]"; but "wasn't being very cooperative, as far as what happened." Tr. 274.

{¶6} McKee was Chainze's sister. Tr. 261. Patrolman Ricker testified that, when he first arrived, McKee was walking away from the vehicle but then turned around and walked back towards the vehicle. Tr. 252. According to Patrolman Ricker, McKee appeared to be "upset about the situation," "and she kept just kind of aimlessly walking around * * *." Tr. 253. Patrolman Ricker attempted to speak with McKee at the scene but testified that "she was very uncooperative" at that time. Tr. 265. Patrolman Weidman also testified that McKee was "very intoxicated at the time so it was difficult to speak with her." Tr. 275.

{¶7} After the ambulance arrived, Branson was taken to St. Rita's Hospital where he was pronounced dead at 4:24 A.M. Ex. 74. Tr. 273, 519. Patrolman Ricker transported McKee to the hospital. Tr. 259. He testified that McKee

> **was very concerned about her family and friends in the community, what they would think of her being involved in this type of situation again after having just been shot approximately two weeks ago in another after-hours establishment.**

Tr. 268. McKee was subsequently transported from the hospital to the local jail to give her the opportunity to "sober up." Tr. 280.

{¶8} Patrolman Weidman testified that, after Branson was pronounced dead, she went from the hospital to the police station to help with the witnesses until another police officer, Sergeant Jason Garlock ("Sergeant Garlock"), received a report that Branson had been shot at 975 St. Johns Avenue in Lima. Tr. 276. Sergeant Garlock testified that he knew this location to be "an after-hours * * * gambling establishment" that was associated with Cobb. Tr. 615, 625. He indicated that the building at this address combined a business and a residence. Tr. 625. Sergeant Garlock went to this location where he observed a blood trail in the snow on the sidewalk outside this address. Tr. 616.

{¶9} At this point, Sergeant Garlock called for other officers to secure that location. Tr. 616-617. Patrolman Weidman and Detective Todd Jennings ("Detective Jennings") were among those who responded. Tr. 276, 617. On arrival, the officers formed a perimeter around this location. Tr. 276, 642. Detective Jennings then received word that a person was inside the building. Tr. 642-643. The police then approached and entered the building, finding a man identified as Jerome Fuqua ("Fuqua") inside. Tr. 278, 631, 643-644. After searching him for weapons, Patrolman Weidman transported Fuqua to the police station where he was interviewed by Detective Steven J. Stechschulte ("Detective Stechschulte"). Tr. 278-279, 743.

{¶10} After obtaining a warrant, the police searched the location and took multiple photographs. Tr. 586, 646. The police found that the blood trail on the

sidewalk outside continued through the establishment to a room with a pool table. Tr. 650-660. Ex. 40-41, 44-45, 57-61. The police then discovered one shell casing under a stool in this room. Tr. 660, 714. Ex. 61. Detective Jennings testified that the police did not find any shell casings outside of the building. Tr. 715. However, while the police were searching the property surrounding the building, they discovered a handgun under a chair that was beside a utility shed. Tr. 663. This utility shed was located behind the main building. Tr. 663.

{¶11} Officer Gregory Adkins ("Officer Adkins") examined the sports utility vehicle where the police first encountered Branson. Tr. 570. He took several photographs of the blood on the seat where Branson had been. Tr. 571. He testified that he found a "pair of sweatpants, a jacket, and a pair of shoes" on this seat. Tr. 570-571. Officer Adkins stated that he discovered $430.00 in the left front pocket of the sweatpants and a cellphone in the jacket. Tr. 570, 574, 576, 578.

{¶12} After Sergeant Garlock returned to the police station, he received a call from Cobb. Tr. 618-619. In this recorded conversation, Cobb stated that he had been gambling with several others at his pool table and was "winning all the money." Ex. 75. He stated that one of the people present—a short guy—"sucker punched" him in the face and then "the motherf**ker with one arm pulled a God d**n pistol * * *." Ex. 75. "Somebody told me he tried to rob Joe Pete. So while he's trying to grab the money—he's only got one f**kin arm to be honest, I snatched the pistol. I shot the dude through the leg." Ex. 75.

{¶13} Cobb told Sergeant Garlock, "I'm gonna tell the truth. I took the pistol and I shot the motherf\*\*\*er with it, man." Ex. 75. Cobb said that he believed his "life was in danger." Ex. 75. Sergeant Garlock then asked who was present for the shooting. Ex. 75. Cobb said that "the dude with one arm" was with Chainze, three girls, and a short guy. Ex. 75. He stated that he believed he was being robbed at the time of the shooting and indicated that Chainze had tried to rob him previously. Ex. 75. Cobb stated that he was going to turn himself into the police. Ex. 75.

{¶14} Later in the day on January 15, 2019, Cobb came to the police station where he sat for an interview with Detective Jennings and Sergeant Garlock. Tr. 622, 681, 720, 742. Ex. 76. Cobb stated that, on the prior evening, he went to a local bar where he saw Chainze with his friends. Ex. 76. Cobb told Chainze about his establishment on St. Johns Avenue and invited him to see the place. Ex. 76. Cobb stated that Chainze and his friends then met him at his establishment. Ex. 76. Cobb described what happened next as follows:

> **So we go in there, you know what I'm saying, and we have a couple drinks at the so called bar \* \* \*. He said, 'Come on man. Let me shoot twenty with you.' I said, 'Yeah.' He said, 'Yeah.' I said, 'Come on.' So we started gambling. \* \* \* So we shootin'. We shootin'. We shootin'. I lost about eight hundred dollars, right? Which, I'm losing fair and square, right? I ain't gonna f\*\*k. I'm losing. So now that the dice is changing, I'm winning about two or three thousand. So I'm shootin'. So a little black girl, she told \* \* \* Chainze, 'Come on man, I'm ready to go. I'm ready to go.' He's like, 'Okay. Okay.' So I'm \* \* \* gambling. I'm not paying a lot of attention to what they are doing. I gotta a pile of money in front of me. Okay? So I'm gambling. Next thing I know. Somebody came beside me. And like, bam! [Gestures as**

> **though someone is striking him in the face.]  And I'm like, 'God D\*\*n.'  So, I a swung back.  That's how my hand got messed up.  I hit the motherf\*\*\*ker back.  Boom.  There's this other dude who came from the side \* \* \*—the Dude with a nub [Branson], right?  So, I is like, 'What the f\*\*k?'  I say, 'Man, y'all.  It's a robbery.'  \* \* \* So, they gonna hold a gun, right?  So I snatched that b\*\*\*h, [the gun] right?  I tried to shoot the motherf\*\*ker in his leg.  Just like, wow.  This ain't gonna happen.  So I took the gun and bam.  I shot the mother\*\*ker.  There's a girl up under the [pool] table.  \* \* \* The others run.  I could've shot all of them.  I could have easily, easily.  I saw Chainze like he was trying to reach for something.  So I was watching him, but he ran out of the building.  \* \* \* So, I let them all go.**

Ex. 76.  He stated, "I shot one time.  I know what I did."  Ex. 76.  He then stated that he went to the porch on his establishment and watched them leave in their cars.  Ex. 76.  Cobb explained that he lived at the establishment on St. Johns Avenue with Fuqua, who was present in the room during the incident.  Ex. 76.  But Cobb stated that, after the shooting, he was afraid to stay at his establishment, so he went to his girlfriend's house where he stayed the night.  Ex. 76.

{¶15} After hearing Cobb's explanation of this incident, the police officers asked him several questions:

> **Police Officer:  So the dude with the nub, that's the dude that had the gun?**
>
> **Cobb: Yeah.  I know that he's the one that had the gun.  \* \* \***
>
> **Police Officer: And then where did he point the gun at you at?**
>
> **Cobb: He just pulled the gun out.**
>
> **Police Officer: And what did you do?**

-8-

**Cobb: I took the gun and shot * * * his a**.  I shot him.**

Ex. 76.  Cobb stated that he was "trying to like pop him in his leg" because he was

not "trying to kill nobody."  Ex. 76.  When asked why he fired the gun, Cobb said,

> **Because there's a whole bunch more people.  * * * How the f**k I know what they got?  So you shoot * * * and make them get the f**k outta here.  I can't watch everybody.  Seriously, I can't watch everybody.  You can't do that.  * * *  I know Chainze has robbed a thousand motherf**kers.  Okay.  So my thing is I got to keep the mother**kin gun pointed away.  You know what I'm sayin'.  I gotta do what I gotta do.**
>
> **\* \* \***
>
> **If a motherf**ker came into your house, what would you do if a motherf**ker rob you?  * * *  Let me tell you a secret now, if it's just me and him and he's trying to rob me, * * * oh, I'd handle his little a*s.  But you got three other motherf**ker dudes and you got girls.  And them girls, they more dangerous than men now days.  You got to watch everybody.  * * * You pop a n****r in the leg.  Like, boom.  Excuse my French.  Everybody say, 'Oh. Let's get the f**k outta here.'  You send a warning.  You know what I'm sayin'.  And it did work.  * * * They still got money.**

Ex. 76.  He then told the police officers that "d**n near everything I told you is

true." Ex. 76.  He stated that he was not "going to implicate anybody else" and that,

"as far as [his] * * * part" is concerned, his story is "what happened."  Ex. 76.

{¶16} The police then stated that they discovered the gun on the premises of

Cobb's establishment.  Ex. 76.  They also informed Cobb that they had found

ammunition in his establishment that matched the gun that was used to shoot

Branson. Ex. 76.  In response, Cobb said, "You might find a whole bunch of ammo

in there because last time I got raided, y'all gave me all the ammo and all the other

s**t back.  There might be ammo in the building.  I don't know." Ex. 76.  He also stated that he did not have a gun on him on the night of the shooting.  Ex. 76.  When asked again where the gun came from, Cobb replied, "I'm not gonna go through all that, man.  I'm telling y'all as much as I can tell ya." Ex. 76.

{¶17} After Detective Jennings and Sergeant Garlock left the interview room, Detective Stechschulte entered and had a brief conversation with Cobb.  Ex. 76.  Tr. 742-743.  Detective Stechschulte informed Cobb that Fuqua had already spoken with the police.  Ex. 76.  According to Detective Stechschulte, Fuqua told the police that he had the gun; that he gave the gun to Cobb; and that Cobb then fired the gun.  Ex. 76.  Cobb then stated, "I wasn't goin to incriminate nobody.  I told them that.  I draw a line.  I'm not trying to get nobody in trouble, man." Ex. 76.  He said that he "basically told them [the detectives] everything but one little thing I didn't tell them because that's incriminating somebody.  Like I told them, I'm not incriminating nobody." Ex. 76.  He then told Detective Stechschulte the following:

> **I'm losing about four or five hundred dollars from the get go. Okay.  Now, I got lucky.  Now, I'm winning like two or three thousand.  The little girl came to Branson, "Come on.  I'm ready to go.  I'm ready to go.'  He said, 'Okay, baby.  Okay, baby.  All right.'  I don't know what the f**k she did 'cause I'm gambling. I'm shooting dice.  * * * This * * * dude who hit me in the eye right here.  Boom.  And I fire back, like bam.  And the motherf**ker with that God d**n nub, he done some s**t.  * * * They push me to the wall.  I said, 'Oh, this is a robbery.'  I said, 'Y'all go ahead.  Y'all go ahead.'  They grab all my money and s**t.  Then, I hate to say I got lucky.  Hate to say I got lucky.  But**

> **I got the pistol. Tell myself I'm gonna shoot the motherf\*\*ker in the leg, will get the motherf\*\*kers outta here. Boom. Somebody said I shot him in the side—I don't know. You know what I'm saying? And that was the whole night, man.**

Ex. 76. Cobb then told Detective Stechschulte, "I basically told them [the detectives] the same thing." Ex. 76. He also indicated that he came to a realization about Branson just before the shooting:

> **It just dawned on me 'cause that—I kept looking at that f\*\*kin nub, like thinking what the f\*\*k this nub, this nub. Oh, that the same mother\*\*ker who just robbed Joe Pete. You know what I'm saying? It wasn't dawning on me.**

Ex. 76. Detective Stechschulte then asked why Cobb did not call the police if there had been a robbery. Ex. 76. Cobb replied, "There's such thing as a code. You don't involve no police 'cause if you do, the s\*\*t come back on you." Ex. 76.

{¶18} Detective Jennings testified that Chainze was not forthcoming in his first police interview. Tr. 639. However, Chainze subsequently returned to the police station and gave a statement. Tr. 639. At trial, Chainze testified that, on the night before the shooting, he had gone to a local bar with Branson, McKee, "a couple females," and a friend named Damien White ("White"). Tr. 341-342. They had traveled to the bar in two separate vehicles. Tr. 344. While they were at the bar, Branson and Chainze were drinking. Tr. 344. Cobb was also at the bar; approached their group; and invited them to "come to [his] * * * establishment * * *." Tr. 343. Chainze testified that he knew Cobb as "an old headed gambler * * *." Tr. 339.

{¶19} Chainze testified that everyone in their group left the local bar and went over to Cobb's establishment on St. Johns Avenue. Tr. 345, 346. He stated that, when he arrived at Cobb's place, there was, in addition to Cobb, "another older man behind the bar." Tr. 345. Chainze testified that "all the females started drinking." Tr. 346. At some point, Cobb brought out "a cup full of dice" and "threw them on the table * * *." Tr. 347. Chainze walked over and began to gamble with Cobb at the pool table. Tr. 347, 349. After about five minutes, Branson walked over and began to gamble with them. Tr. 347.

{¶20} Chainze stated that "a lot of money" was involved and that he quit after he "had lost." Tr. 352. He testified that Cobb and Branson subsequently got into an altercation. Tr. 354-355. Chainze stated that Cobb had been "sliding the dice" instead of "shaking the dice * * *." Tr. 352, 354. He explained that this was considered cheating and that Branson then "picked his money up that was in front of him" and that Cobb "grabbed his arm. He [Branson] only got one arm. So he tussling to get his arm loose." Tr. 354. White saw these two "tussling * * *." Tr. 353. White came towards the pool table and hit Cobb. Tr. 353, 355. White and Cobb "both go down" and hit the ground. Tr. 353, 356.

{¶21} Chainze testified that White broke free of the fight, got up, and headed for the door. Tr. 357.

> **When all that go on, my uncle [Branson] want to get everybody *** towards [the] *** door ***. And they in the doorway trying to get out, but he [Cobb] got different doors to where it's like **

> **\* a maze, for real.  So they end up in the wrong side going out.
> They end up coming back through the same door.**

Tr. 353.  Chainze stated that, while a couple of the girls headed for the door with Branson, "one girl was under the pool table[.]"  Tr. 356, 358.  Chainze stated that, by this time, Cobb had "somehow \* \* \* got a gun \* \* \*."  Tr. 357.  He testified that

> **[Cobb] shoot the gun three times towards the door, 'Y'all get the
> f\*\*k out of my establishment[.]' \* \* \* And he turned to me, look
> at me, tell me to get the girl [who was under the pool table].  I
> make her drop the little money she had on the floor \* \* \*.  He let
> me out.**

Tr. 353.  *See* Tr. 358.  Chainze then testified that he said, in response, "[H]ey, hold on, like don't shoot.  Don't shoot."  Tr. 358.

{¶22}  Chainze stated that he then went outside with the girl who had been under the pool table and that he remembered hearing Branson "saying he was hit in the doorway and his foot was sliding."  Tr. 358.  Chainze looked down and saw "blood dripping."  Tr. 359.  He helped Branson get into his vehicle with White and McKee.  Tr. 359.  White began driving the vehicle away with McKee in the passenger seat.  Tr. 360.  Chainze was with Branson "in the back."  Tr. 360.  Chainze testified that, at this point, Cobb came outside fired his gun "three more times in the air."  Tr. 358, 360.  Chainze stated that White

> **start[ed] the car up.  We tell him to go.  \* \* \* I'm telling Dame
> [White] to go, but we on rims, so in the snow \* \* \* this ain't really
> good traction.  But he ends up getting us up out of there.  And
> then we ended up wrecking.**

Tr. 360. Chainze stated that their vehicle "slid into a pole" on Michael Avenue. Tr. 360. He said that he "made him [White] take off * * * once the police was on they way * * *" because White "had a warrant." Tr. 361.

{¶23} Chainze testified that he then "pulled him [Branson] out" of the vehicle * * *." Tr. 360. Chainze stated that he did not cooperate with the police when they arrived and that he was placed into a police car. Tr. 361. He told the officers that the shooting occurred at the scene of the accident. Tr. 371-372, 378-379. At trial, he admitted that this was a lie. Tr. 381, 422. Chainze explained that he refused to cooperate with the detective because he "wanted to get to the hospital." Tr. 362, 371, 381. He testified that he was cooperative the second time that he spoke to a detective. Tr. 362.

{¶24} On cross-examination, Chainze testified that, at the time of trial, he was in jail for a parole violation and that he had been previously convicted of robbery. Tr. 364, 367. Chainze testified that he was found to have crumpled up dollar bills in his pockets on the night of the shooting, but he said that this is how he kept his money. Tr. 420-421. While Chainze admitted he lied on the night of the accident, he stated that he told the truth during his second encounter with the police. Tr. 371-372, 421.

{¶25} Paige Schaad ("Schaad") was one of individuals who had been with McKee, Branson, Chainze, and White at Cobb's establishment. Tr. 425, 428. After the shooting, she got into a different vehicle than Branson. Tr. 444. The vehicle

that she was in came upon the scene of the accident after the police had arrived. Tr. 444. After speaking with the police, she went to the hospital where Branson was taken and then to the police station. Tr. 446-447. She was interviewed two times after she was taken to the police station. Tr. 464.

{¶26} During the second interview, Schaad indicated that she believed that Cobb was getting robbed before the shooting. Tr. 464, 492. *See* Tr. 452-453. At trial, the following exchange discussed what Schaad told the police during this interview:

> **[Defense Counsel:] And so what you told them was that—that Branson—that you had asked Branson for a cigarette and he was acting weird, right?**
>
> **[Schaad:] Yes.**
>
> **[Defense Counsel:] And you don't know him all that well, but what you were perceiving that night you thought something was just awful weird, right?**
>
> **[Schaad:] Yes.**
>
> **[Defense Counsel:] Um, is that with relation to the other folks too or just Branson?**
>
> **[Schaad:] No. It was just when I had just approached him.**
>
> **[Defense Counsel:] Approached?**
>
> **[Schaad:] Branson and Chainze.**
>
> **\* \* \***
>
> **[Schaad:] Yeah. But, I mean, I was just saying like when I approached that's when he was weird.**

[Defense Counsel:] Okay.  And that's the vibe you got, right?

[Schaad:] Yeah.  Yes.

[Defense Counsel:] Okay.  Um, and then in your statement you said that—that Damian [White] walks up to Kenny [Cobb] and just started fighting with him, right?

[Schaad:] Yes.

[Defense Counsel:] And you couldn't understand why, right?

[Schaad:] Yes.

[Defense Counsel:] You also said as this was going on they, and you refer to Chainze and Branson, started scraping up the money, right?

[Schaad:] Yes.  I did say that.

* * *

[Defense Counsel:] Um, in the statement that you gave * * * it looked to you as if these guys were robbing Kenny [Cobb] and he was fighting back against them, right?

[Schaad:] Um, you can say that.

[Defense Counsel:] And when you gave your statement previously you had said that you heard one shot?

[Schaad:] I heard I said two.  Two or three.

[Defense Counsel:] Two to three today.  When you testified before, * * * didn't you, in fact, say that you just heard one shot?

[Schaad:] Um, I'm not sure.  * * *

Tr. 493-494, 500. The police later contacted Schaad to arrange a third interview to discuss why she believed that Cobb was getting robbed on the night of the shooting. Tr. 492-493.

{¶27} On January 24, 2019, Schaad returned to the police station for a third interview in part because she learned that the police had her phone. Tr. 492. She had given her phone to Branson on the night of the shooting to keep for her in his pocket. Tr. 491-492. The police had discovered her phone in Branson's jacket. Tr. 578. During this interview, Schaad informed the police that she had lied to them previously because she was scared and drunk. Tr. 447, 449. However, she did state that she believed Cobb did not intend to shoot Branson. Tr. 494.

{¶28} At the time of the trial, Schaad was in jail for failing to appear at court in this case. Tr. 424-425. At trial, Schaad testified that McKee was her cousin by marriage and that she was familiar with Chainze. Tr. 463. However, she stated that she did not meet Cobb or Branson before the night of the shooting. Tr. 463. She stated that she went to a local bar with McKee, Branson, White, Chainze, and another girl, who went by the name "Little." Tr. 425. Schaad was drinking at this local bar when Cobb invited them to come to his after-hours establishment. Tr. 427, 429.

{¶29} Schaad testified that, when she got to Cobb's place, she sat down at the bar and had some more alcohol to drink. Tr. 429. She said,

> **Me and Kendrah [McKee] were in the bathroom most of the time**
> **cause I'm like a really emotional drunk so I was in the bathroom**
> **crying most of the time. * * * [T]he guys were playing games on**
> **the pool table and I was just sitting between the bar, the back of**
> **the bar drinking * * *.**

Tr. 429-430. She clarified that Chainze and Branson were the ones gambling with Cobb at the pool table. Tr. 430.

{¶30} At some point, "Kenny [Cobb] and the boys were arguing," but Schaad was "not sure what it was about" because she "really wasn't paying attention." Tr. 435. She stated that she did not remember seeing White get involved in a physical altercation. Tr. 439. She testified that she just remembered hearing "two or three gunshots." Tr. 440. Schaad stated that she began to run out of Cobb's establishment and that, "when [she] was outside all [she] seen was Dame [White] kick the door open and they was right there. He was helping—Chainze was helping Branson get out of the house." Tr. 441.

{¶31} Schaad testified that she got into a car with Little while everyone else in their group got into Branson's vehicle. Tr. 443. She stated that, at this point, Cobb came out of the establishment with his gun and that she "ducked down" in the car while Branson's car "pulled off real fast." Tr. 443. She then testified that

> **[A]fter he [Cobb] went inside that's when we were getting ready**
> **to pull off. And then we start hearing a whole bunch of sirens and**
> **so we followed the police cars. And that's when we seen they had**
> **gotten into a wreck.**

Tr. 443. She testified that, when she arrived at the scene of the accident, she saw Branson "laying down" but could not see the posture of his body from her vantage point. Tr. 445. From the scene of the accident, she went to the hospital and then to the police station where she was interviewed. Tr. 446.

{¶32} On cross-examination, Schaad stated that, when she was at the local bar, she did not hear anyone mention that they were planning to rob Cobb at his establishment. Tr. 499. On redirect, Schaad affirmed that she heard an argument about cheating at the time that White went over to the pool table and got into a physical altercation with Cobb. Tr. 501. She further affirmed that she saw Branson and Chainze grabbing money off of the pool table and that some of the money was falling onto the floor. Tr. 502. Schaad indicated that neither Branson nor Chainze produced a weapon during this altercation. Tr. 502.

{¶33} On May 3, 2019, the police were able to locate and interview White. Tr. 310. White stated that, in between the shooting and this interview, he had been avoiding the police because warrants had been issued for him. Tr. 310-311. At trial, White testified that, on January 14, 2019, he had gone to a local bar with Branson, Chainze, "and females." Tr. 286. White stated that he did not "know they [the females'] name[s]" but remembered that there were "three or four" of them. Tr. 286, 289. When asked whether he was drinking alcohol at this local bar, White replied, "I was drinking all that day." Tr. 288.

{¶34} At some point, he and his associates went to an establishment "on * * * St. Johns." Tr. 288. At this establishment, White continued drinking "at the bar with the females" while Chainze, Brandon, and an older person were gambling at a pool table in the room. Tr. 289, 290-291. White indicated that he heard what sounded like an argument:

> **I mean * * * they already was just loud anyway because they was intoxicated anyway, you feel me, so, yeah, I didn't think nothing of it, you feel me, for real, for real.**

Tr. 293. But White heard Branson say that he was being cheated. Tr. 294. White indicated that a "tussle" between Branson and the older person began. Tr. 295.

{¶35} During his testimony, White affirmed that, at the time this tussle began, he did not see anyone produce a firearm; that he did not see anyone in his group approach Cobb in a threatening manner; and that he did not see Chainze involved in this physical altercation. Tr. 297-298. However, White testified that he went up to the older person and "knocked him on the floor * * *" because the older person was bigger than Branson and because Branson only had one arm. Tr. 296.

{¶36} White testified that he then got up and ran out the door. Tr. 296. He then remembered hearing someone say, "I'm hit." Tr. 297. But White did not remember hearing any gunshots. Tr. 297. White said:

> **I jumped in [the car]—I was telling them girls to drive the car. Everybody was panicking. So when they panicked I just—they threw him in the backseat and we took off and we wrecked down the street.**

Tr. 297. White stated that he was driving with Branson, Chainze, and one of the females in the vehicle. Tr. 299. He testified that they told him to drive to the hospital and that they got into an accident on the way. Tr. 300.

{¶37} White affirmed that the vehicle crashed into a utility pole because "it was icy and [he] * * * was drunk." Tr. 300-301. White testified as follows about what happened after the accident:

> **I jump out the window of the truck. I started ringing people's door, knocking on the door and tell them to call somebody. Somebody needs some help.**
>
> **I run back. I'm making sure—I'm asking everybody is they okay. At the time I got warrants. So everybody was saying they was okay. They was cool. I'm like, I just told people to call for help and I left.**

Tr. 301. White stated that the warrants were for "OVI and possession" of cocaine. Tr. 302. He affirmed that he did not want to be caught having "crashed into a pole intoxicated" given that he had "OVI warrants." Tr. 302.

{¶38} White admitted that he did not want to give a statement to the police and that he had tried to avoid the police for several months. Tr. 302, 310. Further, after the police had located him, White went to prison as the result of one of the prior charges that had been pending against him. Tr. 303-304, 312. On cross-examination, the following exchange occurred regarding the initial statement that White had given to the police:

[Defense Counsel:] Mr. White, just getting back to your statement here. So, what I had asked you previously was that Branson was upset cause he thought that Mr. Cobb was cheating him, correct?

[White:] Yes.

[Defense Counsel:] Okay. And when you gave a statement to the police you even said that Branon was a sore loser, right?

[White:] Yeah.

[Defense Counsel:] He had an attitude, right?

[White:] Uh-huh

[Defense Counsel:] And * * * you even got into it with some people in the street about that, didn't you? Right?

[White:] Yes.

[Defense Counsel:] And what you said to the officer was that he made a dumba** f***ed up decision. Right? Branson?

* * *

[White:] Yes.

* * *

[Defense Counsel:] * * * And you also told the officer that Branson swung on Kenny [Cobb], right?

[White:] Yes.

[Defense Counsel:] And you said that you had tackled Kenny [Cobb], correct?

[White:] Yes.

* * *

[Defense Counsel:] When you talked to Detective Jennings, when you went in there, he never said the word robbery to you, isn't that true?

[White:] Not * * * that I know of.

[Defense Counsel:] Okay. You were the first one to volunteer the word robbery to Detective Jennings, isn't that right?

[White:] Yeah. Somebody had told me that.

[Defense Counsel:] Were you using drugs that night?

[White:] I was drunk. I just drank.

[Defense Counsel:] Just drinking, huh?

[White:] Had some, probably had some weed. That's all.

Tr. 324-325. The cross-examination continued as follows:

[Defense Counsel:] All right. You're aware that one of the girls said that you went and punched Kenny [Cobb], right?

[White:] No. I wasn't aware of that.

[Defense Counsel:] Okay. So, if somebody came in here and said that they'd be lying about it, is that right?

[White:] Yeah, cause we got to tussling * * *.

[Defense Counsel:] So, you're tussling?

[White:] Yep.

[Defense Counsel:] Branson takes a swing at Kenny [Cobb], right?

[White:] Yep.

**[Defense Counsel:] Okay. And it's you and the two Tuckers [Branson and Chainze] and Kenny [Cobb] at this point, right?**

**[White:] Yeah—**

**[Defense Counsel:] Correct?**

**[White:] –And the females, yep.**

**\* \* \***

**[Defense Counsel:] And Branson's all upset because he feels like Kenny's cheating him, is that right?**

**[White:] Yes.**

Tr. 328-329. On redirect, White testified that, as a result of the events of that evening, he "messed [his] * * * lip up and * * * had busted the side of my face." However, he was not sure whether this was because of the physical altercation or because of the subsequent accident. Tr. 331-332.

{¶39} On February 14, 2019, Cobb was indicted on one count of murder in violation of R.C. 2903.02(B) with a firearm specification and a repeat violent offender specification; one count of felonious assault in violation of R.C. 2903.11(A)(2), a felony of the second degree; and one count of having weapons while under disability in violation of R.C. 2923.13(A)(2), a felony of the third degree. Doc. 5. The jury trial was held in between January 27 and January 31, 2020. Tr. 1. At trial, Chainze, White, Schaad, Patrolman Ricker, Patrolman Weidman, Officer Adkins, Sergeant Garlock, Detective Jennings, and Detective

Stechschulte testified. The State also played a recording of Cobb's interview with the police. Tr. 744. Ex. 76.

{¶40} Further, at trial, Dr. Jeffrey Hudson ("Dr. Hudson"), a forensic pathologist with the Lucas County Coroner's Office, testified about the results of Branson's autopsy. Tr. 505-506. Ex. 73. Tr. 508. He stated that Branson had a gunshot wound on his right hip and that there were no other notable external injuries to his body. Tr. 510. Dr. Hudson testified that the bullet had "transected [Branson's] * * * right iliac artery" and that the resulting blood loss from this wound likely brought about his death within "minutes." Tr. 516-517. He then concluded that the cause of Branson's death "was a gunshot would to the right hip" and that the manner of Branson's death was, therefore, a homicide. Ex. 74. Tr. 517, 519.

{¶41} On February 3, 2020, the jury returned a verdict of guilty on the count of felonious assault in violation of R.C. 2903.11(A)(2), finding that the Defense did not prove that Cobb acted in self-defense by a preponderance of the evidence. Doc. 275-276. However, the jury returned a verdict of not guilty on the charge of murder, finding that the Defense proved by a preponderance of the evidence that Cobb acted in self-defense. Doc. 274. After a bench trial on the third count, the trial court found Cobb guilty of having weapons under disability in violation of R.C. 2923.13(A)(2). Doc. 276, 308.

{¶42} On September 10, 2020, the trial court issued its judgment entry of sentencing. Doc. 308. Cobb then filed his notice of appeal on October 6, 2020. Doc. 311. On appeal, he raises the following four assignments of error:

### First Assignment of Error

**The trial court erred when it refused to instruct the jury and refused to consider the newly enacted version of R.C. 2901.05(B)(1) regarding self defense in violation of Cobb's constitutional rights.**

### Second Assignment of Error

**The trial court erred when it instructed the jurors that the only justification for the use of deadly force was in self-defense and failed to instruct on the justification for using deadly force to halt a dangerous, violent felon.**

### Third Assignment of Error

**The trial court erred to the prejudice of Cobb by refusing to permit evidence of the violent character of the decedent and his associate, of their reputation for violence and of a specific instance of violence, where the issue was raised as to which man involved in the altercation was the aggressor, where Cobb was aware of the character and reputation for violence and the specific prior instance of violence and where the trial court imposed the burden of establishing self-defenses upon Cobb thereby deprived Cobb of his right under the Confrontation Clause and to Due Process and a fundamentally fair jury trial under the Fifth, Sixth, and Fourteenth Amendments to the US Constitution.**

### Fourth Assignment of Error

**The verdicts are not supported by sufficient evidence and are against the manifest weight of the evidence.**

*First Assignment of Error*

**{¶43}** Cobb argues that the trial court failed to give a jury instruction that included revisions to the statutory definition of self-defense that became effective after the commission of the alleged offense.

Legal Standard

**{¶44}** "A statute is presumed to be prospective in its operation unless expressly made retrospective." R.C. 1.48. Further, under R.C. 1.58,

> **the reenactment, amendment, or repeal of a statute *does not*: 1) affect the prior operation of the statute or any prior action taken thereunder; 2) affect any validation, cure, right, privilege, obligation, or liability previously acquired, accrued, accorded, or incurred thereunder; 3) affect any violation thereof or penalty, forfeiture, or punishment incurred in respect thereto, prior to the amendment or repeal; and 4) affect any investigation, proceeding, or remedy in respect of any such privilege, obligation, liability, penalty, forfeiture, or punishment.**

(Emphasis Sic.) *State v. Koch*, 2019-Ohio-4099, 146 N.E.3d 1238, ¶ 103 (2d Dist.), citing R.C. 1.58(A)(1-4). Further,

> **the General Assembly does not possess an absolute right to adopt retroactive statutes. Section 28, Article II of the Ohio Constitution prohibits the retroactive impairment of vested substantive rights. *See State v. LaSalle*, 96 Ohio St.3d 178, 2002-Ohio-4009, 772 N.E.2d 1172, ¶ 13. However, the General Assembly may make retroactive any legislation that is merely remedial in nature. *See State ex rel. Slaughter v. Indus. Comm.* (1937), 132 Ohio St. 537, 542, 8 O.O. 531, 9 N.E.2d 505.**

*State v. Consilio*, 114 Ohio St.3d 295, 2007-Ohio-4163, 871 N.E.2d 1167, ¶ 9. The

Ohio Supreme Court has enunciated a two-step analysis in determining whether a

statute ought to apply retroactively from its effective date:

> **First, the reviewing court must determine as a threshold matter whether the statute is expressly made retroactive. *LaSalle*, [*supra*, at 181] \* \* \*, citing *Van Fossen* [*v. Babcock Wilcox Co.*], 36 Ohio St.3d 100, 522 N.E.2d 489, [(1988),] at paragraphs one and two of the syllabus[, *superseded by statute on other grounds, Talik v. Federal Marine Terminals, Inc.,* 117 Ohio St.3d 496, 2008-Ohio-937, 885 N.E.2d 204, fn. 5]. The General Assembly's failure to clearly enunciate retroactivity ends the analysis, and the relevant statute may be applied only prospectively. *Id*. If a statute is clearly retroactive, though, the reviewing court must then determine whether it is substantive or remedial in nature. *LaSalle* at 181 \* \* \*.**

*Consilio* at ¶ 10. The first part of the test determines whether the General Assembly

"expressly made [the statute] retroactive," as required by R.C. 1.48; the second part

determines whether it was empowered to do so." (Brackets sic.) *Hyle v. Porter*,

117 Ohio St.3d 165, 2008-Ohio-542, 882 N.E.2d 899, ¶ 8, quoting *Van Fossen* at

106. Since this issue presents a matter of statutory interpretation, a de novo standard

of review is applicable on appeal. *Consilio* at ¶ 8.

Legal Analysis

{¶45} On December 27, 2018, the General Assembly passed Am. Sub. H.B.

228 ("H.B. 228") and amended the provisions in R.C. 2901.05 that define self-

defense. Am. Sub. H.B. No. 228. This amendment became effective on March 28,

2019. R.C. 2901.05. Under the former version of R.C. 2901.05(A), the accused

had the burden of proving that he or she had used force in self-defense by a preponderance of the evidence. Former R.C. 2901.05(A). But the amended version of R.C. 2901.05 requires the State to prove that the accused did not use force in self-defense beyond a reasonable doubt. R.C. 2901.05(A), (B)(1). *See State v. Petway*, 11th Dist. Lake No. 2019-L-124, 2020-Ohio-3848, ¶ 55.

{¶46} In this appeal, Cobb argues that the trial court erred in determining that the former version of R.C. 2901.05 governed the facts of this case and in determining, on this basis, that he had the burden of establishing self-defense by a preponderance of the evidence. Tr. 222-230, 838. In this case, the offenses that Cobb was indicted on occurred on January 15, 2019, and his trial began on January 27, 2020. Tr. 1, 250. Doc. 5. Thus, Cobb committed the offenses before the effective date of H.B. 228 but was tried after the effective date of H.B. 228.

{¶47} In *State v. Adkins*, this Court considered an appeal in which the defendant argued that, even though he committed the alleged offense before H.B. 228 became effective, the amended version of R.C. 2901.05 should apply to his case because his trial occurred after the effective date. *State v. Adkins*, 3d Dist. Allen No. 1-19-71, 2020-Ohio-6799, ¶ 29. We concluded that

> **the General Assembly never expressly determined that H.B. 228 is to be retroactively applied. *See Koch*[*, supra*,] at ¶ 103. Moreover, R.C. 2901.05, on its face, does not explicitly indicate a legislative intent that it applies retroactively to offenses that occurred before the effective date of the statute.**

*Id*. at ¶ 32, citing *Kiser v. Coleman*, 28 Ohio St.3d 259, 262, 503 N.E.2d 753, 756 (1986) ("If there is no clear indication of retroactive application, then the statute may only apply to cases which arise subsequent to its enactment."). As such, we determined that the defendant "was not entitled to retroactive application of the burden-shifting changes made by the General Assembly to Ohio's self-defense statute, R.C. 2901.05, set forth in H.B. 228." *Adkins* at ¶ 33.

{¶48} Other appellate districts have reached the conclusion that the former version of R.C. 2901.05 is applicable if the accused committed the alleged offense before the effective date of March 28, 2019. *State v. Irvin*, 2020-Ohio-4847, 160 N.E.3d 388 ¶ 26 (2d Dist.); *State v. Stiltner*, 4th Dist. Scioto No. 19CA3882, 2021-Ohio-959, ¶ 56-57; *State v. Brooks*, 2020-Ohio-4123, 157 N.E.3d 387, ¶ 38 (5th Dist.), ¶ 23; *State v. Brown*, 9th Dist. Wayne No. 19AP0004, 2020-Ohio-529, ¶ 23; *State v. McEndree*, 2020-Ohio-4526, 159 N.E.3d 311, ¶ 46 (11th Dist.).

{¶49} However, we note that other appellate districts have found the amended version of R.C. 2901.05 to be applicable if the defendant's trial occurred after the effective date of the amendment. *State v. Pitts*, 2020-Ohio-5495, 163 N.E.3d 1169, ¶ 25 (1st Dist.); *State v. Smith*, 6th Dist. Wood No. WD-19-070, 2020-Ohio-5119, ¶ 32; *State v. Reyes-Figueroa*, 2020-Ohio-4460, 158 N.E.3d 939, ¶ 23

(8th Dist.); *State v. Carney*, 10th Dist. Franklin No. 19AP-402, 2020-Ohio-2691, ¶ 31; *State v. Lewis*, 2020-Ohio-3762, 156 N.E.3d 281 ¶ 26 (12th Dist.).[1]

{¶50} Nonetheless, we will apply our precedent in *Adkins* to the facts of the case before us. *Adkins, supra*, at ¶ 32-33. *See also State v. Williams*, 3d Dist. Allen No. 1-19-39, 2019-Ohio-5381, fn. 1 ("[A]pply[ing] the version of R.C. 2901.05 in effect at the time the defendant committed the offense"). Accordingly, the trial court did not err in concluding that former R.C. 2901.05 applied to this case because the alleged offense occurred before the effective date of the amendment to R.C. 2901.05. For this reason, Cobb's first assignment of error is overruled.

*Second Assignment of Error*

{¶51} Cobb argues that the trial court should have instructed the jury that deadly force may be used "when necessary to apprehend a fleeing felon" or "to prevent the commission of a dangerous, violent felony * * *." Appellant's Brief, 12-13.

Legal Standard

{¶52} "Jury instructions are critically important to assist juries in determining the interplay between the facts of the case before it and the applicable law." *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.3d 1147, ¶ 5.

---

[1] On December 30, 2020, the Supreme Court of Ohio determined that a conflict existed between the decision of the Fifth District Court of Appeals in *State v. Brooks, supra*, and the decision of the Twelfth District Court of Appeals in *State v. Gloff*, 2020-Ohio-3143, 155 N.E.3d 42 (12th Dist.). *State v. Brooks*, 160 Ohio St.3d 1516, 2020-Ohio-6834, 159 N.E.3d 1176. The certified question is: "Does legislation that shifts the burden of proof on self-defense to the prosecution (2018 H.B. 228, eff. March 28, 2019) apply to all subsequent trials even when the alleged offenses occurred prior to the effective date of the act?" *Id.*

> **A jury instruction must provide a correct and pertinent statement of the law that is relevant to the facts of the case.** *State v. White*, **142 Ohio St.3d 277, 2015-Ohio-492, [29 N.E.3d 939,] ¶ 46. "[I]n reviewing a record to determine whether there is sufficient evidence to support the giving of an instruction, 'an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction.'"** *McDonald-Glasco*[, **10th Dist. Franklin No. 17AP-368, 2018-Ohio-1918,] ¶ 30, quoting** *Murphy v. Carrollton Mfg. Co.*, **61 Ohio St.3d 585, 591[, 575 N.E.3d 585] (1991);** *Feterle v. Huettner*, **28 Ohio St.2d 54[, 275 N.E.2d 340] (1971). The trial court will not provide a jury instruction where there is no evidence to support an issue.** *Murphy* **at 591, citing** *Riley v. Cincinnati*, **46 Ohio St.2d 287[, 348 N.E.2d 135] (1976).**

*State v. Hawkins*, 10th Dist. Franklin No. 19AP-546, 2021-Ohio-2899, ¶ 57. Thus, a trial court may "refuse to admit proposed jury instructions which are either redundant or immaterial to the case." *State v. Boyde*, 10th Dist. Franklin No. 12AP-981, 2013-Ohio-3795, ¶ 12, quoting *Bostic v. Connor*, 37 Ohio St.3d 144, 524 N.E.2d 881 (1988), paragraph two of the syllabus. Further,

> **'Ohio Jury Instructions is a compendium of standard instructions prepared by the Jury Instructions Committee of the Ohio Judicial Conference, and is generally followed and applied by Ohio's courts.'** *State v. Thompson*, **2d Dist. Montgomery No. 22984, 2010-Ohio-1680, ¶ 174. 'The instructions found in Ohio Jury Instructions are not mandatory. Rather, they are recommended instructions based primarily upon case law and statutes * * *.'** *State v. Martens*, **90 Ohio App.3d 338, 343, 629 N.E.2d 462, 465 (3d Dist. [1993]). This Court has previously held that, when a 'trial court's instructions closely track the * * * language of the Ohio Jury Instructions,' this 'suggests their accuracy and comprehensibility.'** *State v. Smith*, **3d Dist. Logan No. 8-12-05, 2013-Ohio-746, ¶ 31.**

*State v. Berry*, 3d Dist. Union No. 14-20-05, 2021-Ohio-1132, ¶ 100.

**{¶53}** "Jury instructions * * * are within the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown." *State v. Waldock*, 2015-Ohio-1079, 33 N.E.3d 505, ¶ 91 (3d Dist.).

> **[W]hen reviewing a trial court's jury instructions, the proper review for an appellate court is whether the trial court's refusal to give a requested jury instruction constituted an abuse of discretion under the facts and circumstances of the case.**

*Id.*, quoting *State v. Dailey*, 3d Dist. Hancock No. 5-99-56, 2000 WL 567894, *1 (May 9, 2000). An abuse of discretion is not merely an error of judgment. *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 20 (3d Dist.). Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious. *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 23.

Legal Analysis

**{¶54}** In this case, the trial court gave a lengthy jury instruction for self-defense. Tr. 952-955. We note that the jury instructions given by the trial court on self-defense "closely track the suggested language of the Ohio Jury Instructions" on this matter. *Smith*, 2013-Ohio-746, at ¶ 31. *See Ohio Jury Instructions*, CR Section 421.19 (Rev. Sept. 12, 2020). Tr. 952-955. *See* Tr. 944-945. This "suggests their accuracy and comprehensibility." *Smith*, 2013-Ohio-746, at ¶ 31. We will keep this in mind as we proceed to examine Cobb's challenges to the jury instructions.

**{¶55}** On appeal, Cobb argues that the trial court erred by failing to instruct the jurors (1) that "a private citizen has the same arrest powers as a law enforcement

officer to apprehend a person without a warrant when there are reasonable grounds to believe the person committed a felony" and (2) that "a private citizen has the same authority to use deadly force to stop the commission of a felony or to halt a fleeing felon as does a police officer." Appellant's Brief, 13-14.

{¶56} In arguing that a private citizen has "authority to use deadly force * * * to halt a fleeing felon," Cobb references R.C. 2935.04, which reads as follows:

> **When a felony has been committed, or there is reasonable ground to believe that a felony has been committed, any person without a warrant may arrest another whom he has reasonable cause to believe is guilty of the offense, and detain him until a warrant can be obtained.**

R.C. 2935.04. However, during the police interview, Cobb was asked why he fired the gun at Branson and gave this answer:

> **Because there's a whole bunch more people. * * * How the f**k I know what they got? So you shoot * * * and make them get the f**k outta here. I can't watch everybody. Seriously, I can't watch everybody. You can't do that.**

Cobb further explained that

> **[t]hey [Branson and his associates] grab all my money and s**t. Then, I hate to say I got lucky. Hate to say I got lucky. But I got the pistol. Tell myself I'm gonna shoot the motherf**ker in the leg, will get the motherf**kers outta here. Boom.**

Ex. 76. He also indicated that he fired the gun to "send a warning" so that "[e]verybody say, 'Oh. Let's get the f**k outta here.'" Ex. 76.

{¶57} These statements clearly indicate that Cobb did not employ deadly force in the process of attempting to effectuate a warrantless arrest of a felon. His

stated intention for firing the gun was to cause Branson and his associates to leave his establishment. Ex. 76. Thus, according to Cobb, he did not use deadly force "to halt a fleeing felon" but to cause the alleged felons to flee. Appellant's Brief, 14. *See also State v. Hunter*, 10th Dist. Franklin No. 88AP-959, 1989 WL 99423, *2 (Aug. 29, 1989).

**{¶58}** The Defense did not present any other evidence that would suggest that Cobb was attempting to effectuate a warrantless arrest Branson or any of his associates. In the absence of any evidence in the record that would suggest that Cobb was attempting to effectuate a warrantless arrest, a reasonable trier of fact could not "reach the conclusion sought by the instruction." *Hawkins, supra*, at ¶ 57, quoting *Murphy, supra*, at 591. As such, the trial court did not abuse its discretion in refusing to include a jury instruction that was "immaterial to the case." *Boyde, supra*, at ¶ 12, quoting *Bostic, supra*, at paragraph two of the syllabus.

**{¶59}** Next, in arguing that the trial court should have instructed the jury that "a private citizen has the same authority to use deadly force to stop the commission of a felony or to halt a fleeing felon as does a police officer," Cobb directs our attention to *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). Appellant's Brief, 13. In *Garner*, the United States Supreme Court considered the constitutionality of a Tennessee statute that allowed a police officer to "use all the necessary means to effect the arrest" of a fleeing felon if the officer has "given

notice of the intention to arrest * * *." *Garner* at 5. The United States Supreme Court concluded that

> **[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead. The Tennessee statute is unconstitutional insofar as it authorizes the use of deadly force against such fleeing suspects.**
>
> **It is not, however, unconstitutional on its face. Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.**

*Garner* at 11-12. This decision addresses when a police officer may use deadly force to prevent the escape of a suspected felon. *Id.*

{¶60} Even if *Garner* was applicable to the case presently before this Court, there is still no evidence that Cobb used deadly force as part of an effort to prevent anyone from fleeing from his establishment. *Garner* at 11. Further, there is also no indication that Cobb attempted to inform or warn those present that he intended to effectuate an arrest. *Garner* at 11-12. *See also Hunter, supra*, at *5-6. Thus, Cobb's reliance on the Supreme Court's decision in *Garner* does not establish that he was entitled to this requested jury instruction.

{¶61} Aside from *Garner*, Cobb directs us to no other legal authority in support of this legal challenge to the jury instructions. As such, Cobb has ultimately

"offered no legal authority that * * * [this requested] instruction was required." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 242. Accordingly, Cobb has not demonstrated that the trial court abused its discretion in deciding not to include this requested jury instruction. Thus, Cobb's second assignment of error is overruled.

### Third Assignment of Error

{¶62} Cobb argues that the trial court erred in excluding evidence of the violent characters of Branson and Chainze.

### Legal Standard

{¶63} "Evid.R. 404 and Evid.R. 405 govern the admission of character evidence. Evid.R. 404(A) specifies *when* character evidence is admissible * * *." (Emphasis sic.) *State v. Barnes*, 94 Ohio St.3d 21, 23, 2002-Ohio-68, 759 N.E.2d 1240, 1244-1245 (2002). Evid.R. 404 reads, in its relevant part, as follows:

> **(A) Character Evidence Generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, subject to the following exceptions:**
>
> * * *
>
> **(2) Character of Victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; * * *.**

**(3) Character of Witness. Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609.**

**(B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.**

Evid.R. 404. Thus, different rules govern the admissibility of character evidence for victims and witnesses. Evid.R. 404(A).

**{¶64}** Evidence of a victim's character "may only be offered in accordance with the * * * dictates of Evid.R. 405[.]" *Smith,* 2013-Ohio-746, at ¶ 15. *See Barnes* at 23. Evid.R. 405 reads as follows:

**(A) Reputation or Opinion. In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.**

**(B) Specific Instances of Conduct. In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.**

Evid.R. 405. "A defendant may successfully assert self-defense without resort to proving any aspect of a victim's character." *Barnes* at 25. For this reason, character evidence "is not an essential component of the defense and falls outside the limited

scope of Evid.R. 405(B)." *Id.* Thus, "Evid.R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor." *Barnes* at 25.

**{¶65}** However, defendants may "testify about specific instances of the victim's prior conduct known to the defendant in order to establish the defendant's state of mind." *Smith*, 2013-Ohio-746, at ¶ 18, quoting *State v. Moore*, 3d Dist. Allen Nos. 1-06-89, 1-06-96, 2007-Ohio-3600, ¶ 59. *See State v. Herron*, 2d Dist. Montgomery No. 28146, 2019-Ohio-3292, ¶ 28; *State v. Gott*, 6th Dist. Lucas No. L-11-1070, 2013-Ohio-4624, ¶ 35; *State v. Ryan*, 2018-Ohio-2600, 115 N.E.3d 659, ¶ 93 (11th Dist.).

**{¶66}** "These events are admissible in evidence, not because they establish something about the victim's character, but because they tend to show why the defendant believed the victim would kill or severely injure him." *State v. Carlson*, 31 Ohio App.3d 72, 73, 508 N.E.2d 999 (8th Dist. 1986). "The critical issue is what the defendant knew about the alleged victim at the time of the confrontation." *State v. Steinhauer*, 4th Dist. Scioto No. 12CA3528, 2014-Ohio-1981, ¶ 29.

**{¶67}** We must resort to Evid.R. 608 when considering the admissibility of evidence of a witness's "character or conduct." Evid.R. 404(A)(3), 608. Evid.R. 608 reads, in its relevant part, as follows:

> **(A) Opinion and Reputation Evidence of Character.** The **credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these**

**limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.**

Evid.R. 608(A). Thus, "Evid.R. 608(A)(1) permits a party to attack the credibility of a witness via opinion testimony if it refers to his or her character for untruthfulness." *State v. Habeeb-Ullah*, 11th Dist. Portage No. 2019-P-0006, 2019-Ohio-4517, ¶ 14.

{¶68} The decision to admit or exclude evidence lies within the sound discretion of the trial court. *State v. Beaver*, 3d Dist. Marion No. 9-17-37, 2018-Ohio-2438, ¶ 12. For this reason, an appellate court will not reverse a trial court's determination on the admissibility of evidence in the absence of an abuse of discretion. *Berry*, *supra*, at ¶ 100. An abuse of discretion is not merely an error of judgment. *Sullivan*, *supra*, at ¶ 20. Rather, an abuse of discretion is present where the trial court's decision was arbitrary, unreasonable, or capricious. *Howton*, *supra*, at ¶ 23.

Legal Analysis

{¶69} Cobb argues that the trial court erred in deciding (1) to exclude a statement made by Detective Stechschulte during the recorded police interview; (2) to exclude statements made by him (Cobb) during the recorded police interview; (3) to exclude White's description of how Branson had responded in the past to losing at gambling; and (4) to prohibit Chainze from testifying about his reputation in the

community. Cobb argues that this excluded evidence was an important part of proving self-defense. We will examine each of these four arguments in turn.

{¶70} First, Cobb argues that a statement made by Detective Stechschulte during the police interview should not have been edited out of the recording played to the jury. *See* Tr. 809, 811-812. In his brief, Cobb states that Detective Stechschulte told him, "It's not the first time Branson tried to rob somebody. That's how he lost his f**king arm." Appellant's Brief, 16-17. This statement apparently refers to a specific incident from Branson's past in which "he lost his * * * arm." *Id*.

{¶71} Detective Stechschulte made this statement to Cobb at a police interview that occurred after the shooting. There is no indication in the record that Cobb was aware of how Branson had lost his arm prior to the police interview. Thus, there is no indication that this incident from Branson's past could have had any effect on Cobb's state of mind at the time of the shooting. At best, this evidence would imply that Branson was the initial aggressor. However, the Ohio Supreme Court has specifically held "that specific instances of a victim's prior conduct are not admissible to prove that a victim was the initial aggressor * * *." *Barnes, supra*, at 23. Thus, Cobb has not demonstrated that the exclusion of this evidence was an abuse of discretion.

{¶72} Second, during several recorded statements to the police, Cobb reported that Chainze had attempted to rob him in the past; that he knew Chainze

-41-

had robbed other people; and that he (Cobb) had heard a one-armed person had robbed someone named Joe Pete. Cobb asserts that these statements should have been admitted into evidence. At trial, an edited recording of his interview with the police was admitted into evidence. Ex. 76. In this recording as edited, Cobb said: "I know Chainze has robbed a thousand motherf\*\*kers." Ex. 76. He also said that, just before the shooting,

> **[i]t just dawned on me 'cause that—I kept looking at that f\*\*kin nub, like thinking what the f\*\*k this nub, this nub. Oh, that the same mother\*\*ker who just robbed Joe Pete. You know what I'm saying? It wasn't dawning on me.**

Ex. 76. Further, in a recorded phone call with the police that was admitted into evidence, Cobb can be heard saying that "[a] dude named Chainze tried to rob me a long, long time ago." Ex. 75. He can also be heard saying, "Somebody told me he [the one-armed person] tried to rob Joe Pete." Ex. 75. Tr. 619. Recordings of the phone call and the police interview with Cobb were admitted into evidence. Tr. 809, 813. Ex. 75, 76. Thus, based upon what we are able to review in the record, the information about Cobb's personal knowledge of Chainze's past does not appear to have been excluded by the trial court. *See* Tr. 685, 688, 697, 698, 745-746.

{¶73} Third, Cobb argues that the trial court erred in determining that White could not testify about Branson's prior behavior while gambling. At trial, the Defense asked White the following question: "And, in fact, this isn't the first time that Branson had some beef about gambling, being a sore lo[]ser, so to speak, isn't

that true?" Tr. 316. The State then objected on the grounds that the scope of this question went beyond reputation or opinion evidence and invited responses that would detail specific instances of Branson's past conduct. Tr. 319. The State also argued that White had testified that had only known Branson for "two, three months" prior to the shooting, making his knowledge on this subject rather limited. Tr. 287, 320.

**{¶74}** In response, the Defense argued that this information was admissible because it related to Cobb's state of mind at the time of the shooting. Tr. 321. However, the Defense also noted that White "hasn't even said whether or not he has information or knowledge on it. And if he doesn't that's where we're at." Tr. 321. The State then pointed to the fact that Cobb indicated, during the police interview, that he was unfamiliar with Branson at the time of the shooting. Tr. 322. After hearing these statements, the trial court sustained the State's objection. Tr. 322-323.

**{¶75}** A review of the police interview indicates that Cobb informed the police that he had prior dealings with Chainze but was unfamiliar with Branson. Ex. 76. During his interview with the police, Cobb did state that, just before the shooting,

> **It just dawned on me * * *—I kept looking at that f**kin nub, like thinking what the f**k this nub, this nub. Oh, that the same mother**ker who just robbed Joe Pete. You know what I'm saying? It wasn't dawning on me.**

Ex. 76. This statement indicates that Cobb had a general awareness that a person with one arm had "just robbed Joe Pete." Ex. 76.

{¶76} However, there is no indication in the record that Cobb would have been familiar with any of the prior specific acts that Branson had committed while gambling. *State v. Vinson*, 11th Dist. Lake No. 2006-L-238, 2007-Ohio-5199, ¶ 66 (holding that "[a] defendant may only introduce specific instances of a victim's prior conduct that are known to the defendant at the time of the incident"). Consequently, Branson's prior behavior while gambling was not relevant to Cobb's state of mind at the time of the shooting.

{¶77} Further, after the trial court sustained the State's objection to the question about Branson's prior "beef about gambling," the Defense was permitted to engage in the following line of questioning with White:

> **[Defense Counsel:] Mr. White, just getting back to your statement here. So, what I had asked you previously was that Branson was upset cause he thought that Mr. Cobb was cheating him, correct?**
>
> **[White:] Yes.**
>
> **[Defense Counsel:] Okay. And when you gave a statement to the police you even said that Branon was a sore loser, right?**
>
> **[White:] Yeah.**
>
> **[Defense Counsel:] He had an attitude, right?**
>
> **[White:] Uh-huh**
>
> **[Defense Counsel:] And * * * you even got into it with some people in the street about that, didn't you? Right?**

-44-

**[White:] Yes.**

Tr. 324. Thus, White was permitted to make general statements about Branson and was only prevented from testifying about more specific instances of Branson's prior conduct. Tr. 316. For these reasons, we cannot conclude that the trial court abused its discretion in excluding this evidence at trial.

{¶78} Fourth, Cobb argues that the trial court erred in not permitting him to cross-examine Chainze about the following statement that he made to the police: "D**n, does Kenny know who I am and what I do in the streets? It ain't a mystery to the police or anybody." Appellant's Brief, 18. Tr. 406, 483. In considering the admissibility of this statement, the trial court first applied Evid.R. 404(A)(3) because Chainze was a witness. Tr. 482-483. The trial court noted that this statement did not fit within the types of character evidence that were permitted for witnesses under Evid.R. 404(A)(3) and Evid.R. 608. Tr. 482-483. *See State v. Kamm*, 8th Dist. Cuyahoga No. 50645, 1986 WL 6966, *2 (June 19, 1986) (holding that, for witnesses, "extrinsic evidence 'may refer only to the witness's character for truthfulness or untruthfulness'"), quoting Evid.R. 608(A)(1); *State v. Tutolo*, 8th Dist. Cuyahoga No. 60071, 1992 WL 47234, *3 (Mar. 12, 1992); *State v. Drummond*, 7th Dist. Mahoning No. 05 MA 197, 2006-Ohio-7078, ¶ 77. As such, the trial court did not permit this statement to be introduced at trial pursuant to Evid.R. 404(A)(3) and Evid.R. 608. Tr. 483.

**{¶79}** However, the Defense argued that this statement was admissible under Evid.R. 404(B). Tr. 479. But Evid.R. 404(B) requires "the proponent of evidence to be offered under this rule" to "provide reasonable notice in advance of trial." Evid.R. 404(B). In this case, the trial court questioned the parties to determine whether the Defense gave advance reasonable notice of this. Tr. 479-482. The trial court concluded that no such advance notice was given by the Defense and that statement was, therefore, not admissible under Evid.R. 404(B). Tr. 483. Having reviewed the trial court's ruling on this statement, we cannot conclude that the trial court abused its discretion by excluding this evidence.

**{¶80}** Even if the trial court erred in excluding this statement, this error was harmless as the Defense was able to challenge Chainze's reliability as a witness on a number of other grounds. *State v. Wegmann*, 3d Dist. Allen No. 1-06-98, 2008-Ohio-622, ¶41 (holding that "any error in the admission or exclusion of evidence will be considered harmless error unless it affects a substantial right of the accused."). During his testimony at trial, Chainze admitted to being uncooperative and dishonest with the police on the night of the shooting. Tr. 373, 361. He also admitted to regularly gambling; having a conviction for robbery; having a conviction for conveying drugs into a detention facility; and having a conviction for marijuana possession. Tr. 339.

**{¶81}** During cross-examination, Chainze admitted that he had previously lied to the police about the location of the shooting and the name of the driver of the

-46-

crashed vehicle. Tr. 371-372. He stated that he was on parole at the time of the shooting. Tr. 370. The Defense questioned him about his robbery conviction and the fact that he was, at the time of the trial, in jail for a parole violation. Tr. 364, 366, 419. Chainze also admitted the he did not want to be charged with robbery for the incident that occurred at Cobb's establishment. Tr. 367.

{¶82} Further, recordings of Cobb's interview with the police and a phone call with Sergeant Garlock were played for the jury. Ex. 75, 76. In these recordings, Cobb stated that Chainze had "robbed a thousand mother\*\*kers" and that Chainze had robbed him previously. Ex. 75, 76. Thus, even if this challenged ruling were erroneous, we conclude that, given this other evidence, the exclusion of this one statement about Chainze's violent character was not ultimately prejudicial to Cobb's defense. Thus, this argument is without merit. Accordingly, Cobb's third assignment of error is overruled.

### Fourth Assignment of Error

{¶83} Cobb argues that the jury instructions given by the trial court led the jurors to reach inconsistent verdicts, demonstrating that the verdicts in this case are against the manifest weight of the evidence.[2]

### Legal Standard

---

[2] The text of Cobb's assignment of error also asserts that the verdicts are unsupported by sufficient evidence. However, the body of his argument contends that "the State clearly had not met the burden of persuasion." Appellant's Brief, 20. Since this argument is not about the State's burden of production but its burden of persuasion, this is an argument about the manifest weight of the evidence. *See State v. Lewis*, 3d Dist. No. 15-20-04, 2020-Ohio-6894, ¶ 28, 30. For this reason, we will only set forth the legal standard for the manifest weight of the evidence.

**{¶84}** In a manifest weight analysis, "an appellate court determines whether the state has appropriately carried its burden of persuasion." *State v. Blanton*, 121 Ohio App.3d 162, 169, 699 N.E.2d 136 (3d Dist. 1997). "Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict." *State v. Jack*, 3d Dist. Marion No. 9-11-59, 2012-Ohio-2131, ¶ 15. Thus, "the appellate court sits as a 'thirteenth juror' * * *." *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). On appeal, courts

> **must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'** *State v. Brentlinger*, **2017-Ohio-2588, 90 N.E.3d 200, ¶ 36 (3d Dist.), quoting** *Thompkins* **at 387.**

*State v. Schatzinger*, 3d Dist. Wyandot No. 16-20-04, 2021-Ohio-167, ¶ 52.

**{¶85}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *Sullivan*, *supra*, at ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27

(3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶86}** Cobb asserts that the jury reached inconsistent verdicts in this case. The jurors returned a verdict of not guilty on the count of felony murder, finding that Cobb had acted in self-defense. Doc. 274. But then the jurors returned a verdict of guilty on the count of felonious assault, finding that Cobb did not act in self-defense. Doc. 275. Cobb argues that these inconsistent conclusions are evidence that the jury lost its way and returned a verdict against the manifest weight of the evidence.

**{¶87}** However, "[i]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict * * *." *State v. Hicks*, 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989), citing *United States v. Powell*, 469 U.S. 57, 68, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984).

> **'[t]he several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.'**

*State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 347, quoting *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978), paragraph two of the syllabus, *vacated on other grounds in Adams v. Ohio*, 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103 (1978).

> **Hence, '[c]onsistency between verdicts on several counts of an indictment is unnecessary where the defendant is convicted on one or some counts and acquitted on others; the conviction generally will be upheld irrespective of its rational incompatibility with the acquittal.'** *State v. Smith*, **193 Ohio App.3d 201, 2011-Ohio-997, [951 N.E.2d 469,] ¶ 22 (3d Dist.), quoting [*State v.*] *Trewartha* [, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 15 (10th Dist.)] * * *, citing** *State v. Adams*, **53 Ohio St.2d 223 (1978). '[J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. * * * [I]t would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts.'** *State v. Gravelle*, **6th Dist. Huron No. H-07-010, 2009-Ohio-1533, ¶ 77, quoting** *State v. Taylor*, **8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶ 10.**

*State v. Bell*, 3d Dist. Marion No. 9-18-40, 2020-Ohio-4510, ¶ 58. Thus, even if the jurors returned a verdict on one count against Cobb that was inconsistent with a verdict on another count against Cobb, this does not suggest that these verdicts are against the manifest weight of the evidence and does not provide a basis for the reversal of either of his convictions. As such, this argument is without merit.

{¶88} Cobb then suggests that these inconsistent verdicts are evidence that the trial court gave inadequate or incorrect jury instructions. However, this argument is speculative. The Ohio Supreme Court has cautioned "that the sanctity of the jury verdict should be preserved and * * * [can]not be upset by speculation or inquiry into such matters to resolve the inconsistency." *State v. Lovejoy*, 79 Ohio St.3d 440, 1997-Ohio-371, 683 N.E.2d 1112 (1997).

{¶89} Further, in his second assignment of error, we evaluated his challenges to the jury instructions that were given by the trial court and found these

arguments to be without merit. For these reasons, we conclude that Cobb has not demonstrated that the verdicts in this case were against the manifest weight of the evidence. As such, his fourth assignment of error is overruled.

*Conclusion*

{¶90} Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Allen County Court of Common Pleas is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**